JAMES L. WICKERSHAM, APPELLANT, V. STATE OF NEBRASKA AND
NEBRASKA DEPARTMENT OF AGRICULTURE, APPELLEES.
354 N.W.2d 134

Filed August 3, 1984.   No. 83-322.

Robert F. Bartle of Nelson & Harding, and Steven C. Smith
of Van Steenberg, Brower, Chaloupka, Mullin & Holyoke, for
appellant.

Paul L. Douglas, Attorney General, and John R.
Thompson, for appellees.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, SHANAHAN,
and GRANT, JJ., and COLWELL, D.J., Retired.

SHANAHAN, J.

James L. Wickersham filed suit in the district court for
Lancaster County against the State of Nebraska and the
Nebraska Department of Agriculture (State) under the State
Tort Claims Act, Neb. Rev. Stat. §§ 81-8,209 et seq. (Reissue
1981). The district court granted summary judgment to the

State. Wickersham appeals. We reverse and remand.

Wickersham's claim against the State relates to a loss of livestock on account of a highly contagious disease, *Brucella abortus*, otherwise known as brucellosis or Bang's disease. Brucellosis causes cattle to abort or have procreational problems. As a part of federal efforts to eradicate brucellosis, the U.S. Department of Agriculture has promulgated regulations known as the Uniform Methods and Rules for Brucellosis Eradication. Those federal regulations supply guidelines for federal-state cooperation, and direct state officials in a program to eradicate brucellosis.

Periodically, the Veterinary Service of the U.S. Department of Agriculture checks the State's eradication program and certifies whether the State's program complies with federal regulation. On occasion, and upon notice from the federal government, the State changed its brucellosis program to comply with federal standards.

The Uniform Methods and Rules for Brucellosis Eradication in part provide:

> B. REPORTING—Activities conducted privately or as part of the official brucellosis eradication program, such as results of agglutination tests or vaccination, shall be reported immediately to cooperating agencies and to the herd owner.
>
> . . . .
>
> G. ADJACENT HERD AND EPIDEMIOLOGICALLY TRACED HERD TESTING—Adjacent herds, or herds sharing common pasture or having other contact with the affected herd, and herds containing previous purchases from or exchanges with the affected herd shall be tested within 30 days of disclosure of the affected herd or be placed under quarantine until blood tested. (See Part III, C)
>
> When the quarantine is released on the brucellosis affected herd, the owners of the potentially exposed herds, as described above, shall be notified of the desirability of a second negative herd blood test. If the owner decides not to have a second test, the representative of the animal health agencies will prepare a statement indicating that the

value of a second test was discussed with the owner and listing the reasons the herd was not further tested. A copy of this statement will be given the herd owner.

Among the statutes pertaining to the state Department of Agriculture is Neb. Rev. Stat. § 54-701 (Reissue 1978), which provides in part:

> The Department of Agriculture shall be vested with the power and charged with the duties of protecting the health of livestock in Nebraska, of determining and employing the most efficient and practical means for the prevention, suppression, control and eradication of dangerous, infectious, contagious or otherwise transmissible diseases among domestic animals . . . ; *Provided,* that as far as practicable the regulations approved by the United States Department of Agriculture shall be adopted.

Wickersham lived and ranched in Sioux County in the northwestern corner of Nebraska, bordering South Dakota and Wyoming. State offices are located in Lancaster County, but the State contracts with local veterinarians for inspection and tests at sale barns and livestock commission companies in Nebraska. Thomas Peddicord is a rancher with operations in Nebraska and South Dakota. As early as January 19, 1980, State authorities discovered the possibility of brucellosis in Peddicord's herd. Later, some of Peddicord's heifers were shipped to Nebraska for sale. In accordance with a State contract, a local veterinarian administered tests to cattle sold at the sale barn in Gordon. Before sale of the livestock to Wickersham, the local veterinarian tested the Peddicord heifers for brucellosis, but the tests were negative.

On January 30, 1980, Wickersham bought 17 head of Peddicord heifers at the Gordon sale barn. The local veterinarian drew blood samples from the heifers and sent those samples to the State laboratory at Lincoln. Upon the samples' arrival at Lincoln it was discovered that the blood samples had hemolyzed, that is, the blood cells in the samples had been destroyed as a result of freezing or other contamination which caused a breakdown of the cells. Although the hemolyzed samples were useless for a brucellosis test, the State did not order retesting of the heifers purchased by Wickersham. The

decision not to retest the heifers was made by State personnel in Lincoln. Meanwhile, back at the ranch, and in keeping with generally recommended practice, Wickersham quarantined the heifers bought at the Gordon sale barn.

On February 19 the director of the state Department of Agriculture issued a brucellosis quarantine order addressed to Peddicord. Peddicord's cattle were quarantined because his cattle had been "determined to be affected with or exposed to brucellosis." The State retested Peddicord's cattle around February 20 and decided it was necessary to identify all purchasers of Peddicord's cattle. On February 25 a State field investigator sent information to Lincoln identifying and locating purchasers of Peddicord cattle, including Wickersham.

Around March 1 Wickersham removed the Peddicord heifers from quarantine and incorporated the heifers into his herd. Approximately 2 weeks later, Wickersham bought an additional 40 head of pregnant cows. After removing those additional cows from quarantine, sometime about April 23, Wickersham placed the pregnant cows in his herd.

On May 2 the State notified Wickersham for the first time that his herd had been exposed to brucellosis. Wickersham again quarantined his cattle. Brucellosis testing by the State around September 12 disclosed that Wickersham's cattle were infected with brucellosis to such a degree that the herd had to be liquidated. Wickersham sold the infected cattle for slaughter and sustained monetary loss due to the decreased sale price and liquidation of the herd on account of brucellosis. A federal epidemiologist expressed the opinion that the Peddicord herd was the source of the brucellosis infecting the Wickersham cattle.

After the State Claims Board disapproved his claim, Wickersham filed suit in the district court for Lancaster County. Wickersham's petition alleged three causes of action: (1) The proximate cause of Wickersham's damage was the State's "negligence, undue delay, and omission in failing to promptly notify" Wickersham about the brucellosis situation; (2) Notwithstanding the State's knowledge of the brucellosis problem in Peddicord's cattle, the State did not promptly

inspect or test the cattle purchased from Peddicord and incorporated into Wickersham's herd; and (3) The State failed to retest Wickersham's cattle, after blood samples from the heifers purchased by Wickersham "were not handled properly" and were hemolyzed before arrival at the State's laboratory, so that such samples were useless for brucellosis testing. (Such "causes of action" may be more correctly characterized as specifications of the State's alleged negligent conduct.)

The State's answer alleged: (1) The conduct of the State was a discretionary function or duty of the State (see § 81-8,219(1)(a)); (2) All acts of the State are alleged as misrepresentations, which are excluded from coverage under the State Tort Claims Act (see § 81-8,219(1)(d)); and (3) All acts of which Wickersham complains occurred outside Lancaster County (see § 81-8,214).

The State moved for summary judgment on the basis of the three specifications contained in its answer. Although the judge mentioned only the venue issue in the body of his order, the trial court nevertheless granted summary judgment to the State without designating a specific reason for sustaining the State's motion.

In general Wickersham questions the trial court's action in sustaining the State's motion for summary judgment. In particular Wickersham assigns as error any determination by the trial court that Lancaster County was not the proper venue for the proceedings.

" 'The issue on a motion for summary judgment is whether or not there is a genuine issue as to any material fact, and not how that issue should be determined. In considering such a motion, the trial court must take that view of the evidence most favorable to the party against whom summary judgment is directed, giving to that party the benefit of all favorable inferences that may be reasonably drawn from the evidence.' "

*Scheideler v. Elias*, 209 Neb. 601, 605, 309 N.W.2d 67, 70 (1981).

In view of the action taken by the district court, we shall discuss each of the three specifications assigned by the State in its motion for summary judgment.

The first question is whether the State's conduct is a discretionary function or duty for which the State cannot be liable due to the exclusion found in § 81-8,219(1)(a):

(1) The provisions of this act shall not apply to:

(a) Any claim based upon an act or omission of an employee of the state . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a state agency or an employee of the state, whether or not the discretion be abused.

Performance of or failure to perform a discretionary function or duty cannot be the basis for liability under the State Tort Claims Act. See *Fletcher v. State*, 216 Neb. 342, 344 N.W.2d 899 (1984); cf. *Dalehite v. United States*, 346 U.S. 15, 73 S. Ct. 956, 97 L. Ed. 1427 (1953) (Federal Tort Claims Act, 28 U.S.C. § 1346(b) and §§ 2671 et seq. (1948)).

That which is protected under the State Tort Claims Act, § 81-8,219(1)(a), is the discretion of a governmental executive or administrator to act according to one's judgment of the best course to be taken. Such discretion includes more than the initiation of programs and activities. Discretion includes determinations or judgments made in establishing plans, specifications, or schedules of operations. Where policy judgment exists, there also exists discretion exempted from liability under the State Tort Claims Act. Cf. *Dalehite v. United States, supra.*

However, the discretionary function or duty exemption in the State Tort Claims Act extends only to the basic policy decisions made in governmental activity, and not to ministerial activities implementing such policy decisions. See *Koepf v. County of York*, 198 Neb. 67, 251 N.W.2d 866 (1977); cf. *Indian Towing Co. v. United States*, 350 U.S. 61, 76 S. Ct. 122, 100 L. Ed. 48 (1955) (Federal Tort Claims Act). In other words, the State is liable for negligence of its employees at the operational level, where there is no room for policy judgment. See *Eastern Air Lines v. Union Trust Company*, 221 F.2d 62 (D.C. Cir. 1955).

In Wickersham's case there is no attempt to impose liability on the State for a policy judgment. The State's acquisition and

accumulation of specific information about the dangerous and contagious disease brucellosis are activities conducted as part of the official brucellosis program in Nebraska. The duty of immediate notification to a Nebraska herd owner is imposed by the regulations under which the State was operating. On the one hand, the duty to notify may be imposed on the State as a result of federal regulation of the State's activities to eradicate brucellosis. On the other hand, the duty of notification may have become self-imposed by the State, if the State has adopted the regulations approved by the U.S. Department of Agriculture. In this latter case the State may have adopted the federal regulations and incorporated those regulations into the State's brucellosis eradication program as appropriate standards for conduct. The State may discover its conduct is contrary to federal regulation, its own regulations, or both state and federal regulations. Ironically, the regulator may have become the regulated. The government, having found itself in a regulatory mesh, can empathize with the governed beset by reams of regulations. In any event, the State's conduct in response to the discovery of brucellosis cannot be characterized as formulation of policy, planning, or discretionary action. The activity of the State moved from the province of planning into the realm of reality by the State's executing a duty imposed by the regulations. It may be that the State's conduct will eventually be evaluated in terms of the specific standards and regulations for the brucellosis eradication program. The State's action or inaction in response to detected brucellosis involved a State operational task governed by recognized regulations. At that point policy had long since passed from the picture.

Moreover, once the State did in fact act, namely, inspect the suspected Peddicord cattle and make tests which provided confirmation of brucellosis, the State was obligated to use due care in protective measures against the confirmed brucellosis. When one under no obligation to act does undertake action, one must act with reasonable care. See *Indian Towing Co. v. United States, supra*. The government, here the State, as well as an individual, must act with reasonable care in reference to action undertaken without an obligation to act. See *Barnum v. Rural Fire Protection Company*, 24 Ariz. App. 233, 537 P.2d

618 (1975); accord *Wolf v. City of New York*, 39 N.Y.2d 568, 349 N.E.2d 858, 384 N.Y.S.2d 758 (1976). See, also, *Wulf v. Rebbun*, 25 Wis. 2d 499, 131 N.W.2d 303 (1964). Having acted in this case, the State's conduct must be evaluated by the standard of reasonable care. Whether the State is entitled to the exemption for "discretionary function or duty" under the State Tort Claims Act at this stage of the proceedings is a question of fact. However, upon the same evidence presented at trial as has been presented in this appeal, the State will more than likely find the exemption of discretionary function or duty unavailable in any respect.

The next aspect of the summary judgment granted to the State relates to § 81-8,219(1)(d) of the State Tort Claims Act, which excludes: "Any claim arising out of . . . misrepresentation . . . ." In support of its assertion that Wickersham seeks recovery for misrepresentation, the State relies on cases such as *Rey v. United States*, 484 F.2d 45 (5th Cir. 1973), and *Saxton v. United States*, 456 F.2d 1105 (8th Cir. 1972). Those federal cases involve situations in which claimants relied on a government veterinarian's misrepresentation about the condition of animals, that is, the veterinarian stated either that the animals were infected with a contagious disease or that the animals were disease-free. The cases suggested by the State have a common thread in a government employee's misrepresentation of the health of animals. In this case Wickersham's petition does not allege any misrepresentation by the State. Wickersham does not allege that any State employee or representative has misrepresented the condition of livestock owned either by Peddicord or Wickersham and does not allege that the State misrepresented its knowledge concerning any cattle in question. Any allegation that the State failed to take proper action, namely, failure to disseminate information to Wickersham or to conduct proper tests, is not a reference to any misrepresentation by the State. Where the gravamen of the complaint is the negligent performance of operational tasks rather than misrepresentation, the State cannot rely upon the misrepresentation exclusion found in § 81-8,219(1)(d) of the State Tort Claims Act. See *Ingham v. Eastern Air Lines, Inc.*, 373 F.2d 227 (2d Cir. 1967). Wickersham's allegation

concerning lack of notification from the State and lack of proper testing relates to the State's negligent inaction and nonperformance of a duty imposed on the State. Summary judgment based on the misrepresentation exclusion found in the Nebraska State Tort Claims Act was error on the part of the trial court.

Finally, there is the question of the proper venue of Wickersham's lawsuit. Section 81-8,214 in pertinent part provides: "The district court . . . shall have exclusive jurisdiction to hear, determine, and render judgment on any suit or tort claim . . . . Suits shall be brought in the district court of the county in which the act or omission complained of occurred . . . ."

"Jurisdiction is the inherent power or authority to decide a case; venue is the place of trial of an action—the site where the power to adjudicate is to be exercised." *State ex rel. Bauersachs v. Williams*, 215 Neb. 757, 759, 340 N.W.2d 431, 433 (1983). Clearly, under § 81-8,214 the district court has subject matter jurisdiction to hear, determine, and render judgment concerning any tort claim defined in the State Tort Claims Act. Because the State has given only conditional consent to be sued and there is no absolute waiver of immunity by the State, requirements of the State Tort Claims Act must be followed strictly. The petition, based on the State Tort Claims Act, must be filed in the district court for the county in which the alleged wrongful act or omission took place. See *Catania v. The University of Nebraska*, 204 Neb. 304, 282 N.W.2d 27 (1979).

The State contends that venue of Wickersham's suit is somewhere outside Lancaster County, because any harm "could only manifest itself in Sioux County." Brief for Appellees at 7. As support for such position, the State relies on *Miller v. State*, 208 Neb. 170, 302 N.W.2d 692 (1981). *Miller* involved a claim for wrongful death as a result of an automobile accident alleged to have been caused by faulty highway construction and maintenance. The road was planned in Lincoln but was located in Wheeler County, Nebraska. The *Miller* lawsuit was filed in Lancaster County. At page 7 of its brief the State suggests: "The essence of *Miller* is that an act or omission occurs in that county in which the alleged results of the

act or omission manifest themselves." *Miller* neither contains such expression nor permits such inference. In *Miller* we stated at 172, 302 N.W.2d at 693: "[T]he action would have to be brought in the county where the act or omission occurred — the county where the accident happened." Therefore, *Miller* does not undermine Wickersham's position.

The question presented in Wickersham's case is, Where did the act or omission occur? More simply, Where's the venue? The answer to the question lies in the definition of the word *occur*. In *Mills v. Aetna Ins. Co.*, 168 Neb. 612, 619, 96 N.W.2d 721, 725 (1959), we recognized the following definition: " 'A word said to be an ordinary one and without technical import. It carries to the mind a sense of origin . . . and in its generally accepted and most popular sense the word "occur" means to happen. . . .' " Black's Law Dictionary 974 (5th ed. 1979) contains the following: "Occur. To happen . . . to take place . . . ." Other definitions of "occur" are "to happen, to take place," Webster's New Universal Unabridged Dictionary 1237 (1983), and "[t]o take place . . . . To be found to exist," The American Heritage Dictionary of the English Language 908 (1981). From the foregoing we conclude that "occur" is a plain and unambiguous word. In reference to the State Tort Claims Act, § 81-8,214, "the county in which the act or omission occurred" means the site where the wrongful conduct actually takes place, not where the results of the wrongful conduct take place or occur. Occur does not include the results of the act or omission, but only the taking place, happening, or coming to pass. See *Leonard v. Abbott*, 366 S.W.2d 925 (Tex. 1963); cf. *Richards v. United States*, 369 U.S. 1, 82 S. Ct. 585, 7 L. Ed. 2d 492 (1962) (Federal Tort Claims Act; "occur" does not mean where the act or omission has an operative effect but where the conduct took place). See, also, *Eastern Air Lines v. Union Trust Company*, 221 F.2d 62 (D.C. Cir. 1955); *Buchheit v. United Air Lines, Inc.*, 202 F. Supp. 811 (S.D.N.Y. 1962).

In the present case information about the Peddicord cattle and the purchase by Wickersham was accumulated and contained at the State's principal office in Lincoln, Lancaster County, Nebraska. There is no indication that the state Department of Agriculture had an office at any place but

Lancaster County. In view of the information possessed by the State, any notification to Wickersham based on such information would have to emanate from Lincoln. Also, those having authority to initiate and direct field activities of the state Department of Agriculture had their headquarters in Lincoln. Tests on bovine blood samples were made at the State laboratories at Lincoln. The recorded results of bovine blood tests were maintained in Lincoln in the office of the state Department of Agriculture. Any decision to retest Wickersham's cattle had to be made in Lincoln by State personnel, because apparently only the State's employees in Lincoln were aware the bovine blood samples had hemolyzed and, therefore, were useless for brucellosis tests. In the final analysis, all people responsible for decisions and action regarding Wickersham's problem were in Lancaster County. Consequently, the correct venue of Wickersham's action is Lancaster County. If the Legislature had intended venue to be the site where the State's wrongful conduct resulted in damage to a claimant, simple language to express such intention and situation was available. By the same token, the Legislature has used uncomplicated language in words of ordinary meaning to declare an unambiguous provision in the State Tort Claims Act: Venue is the place where the state's wrongful act or omission occurred, not where the wrongful conduct has its harmful effect. The venue provision of the State Tort Claims Act is an instance where statutory language and practicality fortunately coincide, leaving little room for debate. We debate the issue of venue no further. The trial court committed error in granting summary judgment based upon improper venue.

For the reasons given, the judgment of the district court is reversed and the summary judgment granted to the State is set aside. This matter is remanded to the district court for Lancaster County, Nebraska, for further proceedings.

REVERSED AND REMANDED FOR
FURTHER PROCEEDINGS.