SECURITY INVESTMENT COMPANY, APPELLANT, V. STATE OF
NEBRASKA AND NEBRASKA DEPARTMENT OF BANKING AND
FINANCE, APPELLEES.

437 N.W.2d 439

Filed March 24, 1989.    No. 87-182.

David A. Ludtke and Kim M. Robak, of Rembolt Ludtke Parker & Berger, for appellant.

Robert M. Spire, Attorney General, and Martel J. Bundy for appellees.

BOSLAUGH, SHANAHAN, and GRANT, JJ., and ENDACOTT and QUIST, D. JJ.

SHANAHAN, J.

Security Investment Company (SIC), assignee of SSS Co., which was formerly an industrial loan and investment company, see Neb. Rev. Stat. §§ 8-401 et seq. (Reissue 1987), appeals from the judgment of the district court for Lancaster County, sustaining the demurrer of the State of Nebraska and Nebraska Department of Banking and Finance and dismissing SIC's action brought under the State Tort Claims Act, Neb. Rev. Stat. §§ 81-8,209 et seq. (Reissue 1987). The State of Nebraska and Nebraska Department of Banking and Finance are collectively called "Department."

SIC claims that damages were sustained by SSS after the Department closed another industrial loan and investment company, Commonwealth Company. SIC alleged that the Department's negligence regarding Commonwealth caused SSS' loss of deposit insurance protection and customer accounts and necessitated reorganization under chapter 11 of

the U.S. Bankruptcy Code. Also, SIC contends that the Department is estopped from denying liability on account of its promises and concealment concerning Commonwealth.

## STANDARD OF REVIEW

"In reviewing an order sustaining a demurrer, the Supreme Court accepts the truth of facts well pled and the factual and legal inferences which may be reasonably deduced from such facts, but does not accept conclusions of the pleader." *Weiner v. Hazer*, 230 Neb. 53, 55-56, 430 N.W.2d 269, 271 (1988).

> When ruling on a demurrer, a court must assume that the pleaded facts, as distinguished from legal conclusions, are true as alleged and must give the pleading the benefit of any reasonable inference from the facts alleged, but cannot assume the existence of a fact not alleged, make factual findings to aid the pleading, or consider evidence which might be adduced at trial.

*Schuyler State Bank v. Cech*, 228 Neb. 588, 593, 423 N.W.2d 464, 468 (1988).

## THE DEPARTMENT OF BANKING AND FINANCE

The Department has general supervision and control over industrial loan and investment companies ("industrials"), and over other financial institutions in Nebraska, and the duty of enforcing Nebraska statutes pertaining to industrials. See Neb. Rev. Stat. §§ 8-102 and 8-401.01 et seq. (Reissue 1987). Section 8-403.02 requires a minimum amount of paid-up capital, surplus, and paid-in undivided profits, and § 8-409.02 limits insider loans. Section 8-403.04 specifies the qualifications for an industrial's executive officers and gives the Department authority to revoke any officer's license in the event of the officer's unsafe or unauthorized operation of an industrial.

If an industrial's capital stock is impaired, its operations are unsafe or unauthorized and endanger interests of its certificate of indebtedness holders, or the industrial refuses or neglects to obey the Department's lawful order, the Department may seize control of the industrial's assets until the industrial is fit to resume business or may dissolve the industrial. § 8-416.

## NDIGC

Pursuant to the Nebraska Depository Institution Guaranty Corporation Act, Neb. Rev. Stat. §§ 21-17,127 to 21-17,145

(Reissue 1987), the Department may approve formation of a corporation (NDIGC) composed of 10 or more depository institutions, including industrials. See §§ 21-17,131(1) and 21-17,132. NDIGC's directors are persons who have served 2 years in an official capacity with an eligible member depository. § 21-17,133. NDIGC is a mechanism for guaranteeing shareholdings, savings, and deposits in member depositories and assists in the detection and prevention of depository insolvencies and liquidations. § 21-17,128.

NDIGC submits its plan of operation to the Department for approval, § 21-17,136, a plan which may be amended with the Department's approval. NDIGC's plan of operation establishes, among other things, the amount of insurance to guarantee each deposit or certificate of indebtedness concerning a member depository. §§ 21-17,131(5) and 21-17,135(1)(a).

The Department must immediately report in writing to NDIGC when the Department has reasonable cause to believe that any of NDIGC's member depositories may be insolvent or in an unsound financial condition. § 21-17,139(3).

NDIGC may make recommendations to the Department concerning solvency, liquidation, rehabilitation, or conservation of any member depository. NDIGC, on a good-faith belief that a member depository's accounts are endangered, may request that the Department apply to the district court for an order placing the Department in charge of the endangered depository. If the Department fails to act on NDIGC's request within 15 days, NDIGC may apply directly to the court for the custodial order concerning the endangered depository. § 21-17,139(8).

Section 21-17,141 provides:

> There shall be no liability for damages on the part of, and no cause of action in tort of any nature shall arise against, any member depository institution, the corporation or its agents or employees, the board of directors, or the department or any of its representatives or employees for any action taken by any of them in the performance of their powers and duties under sections 21-17,127 to 21-17,145, unless such action shall be willful,

wanton, or fraudulent.

## COMMONWEALTH'S INSOLVENCY

Before August 7, 1979, a Department examination showed Commonwealth's unsound financial condition and excessive insider loans in violation of § 8-409.02. However, on August 7, the Department approved Commonwealth and SSS as member depositories of NDIGC.

On February 8, 1980, the Department's second examination of Commonwealth showed excessive insider loans. Nevertheless, on April 28, 1980, the Department approved NDIGC's increase in the insurance, from $10,000 to $30,000, for each certificate of indebtedness of a member depository notwithstanding that the Department knew, or should have known, that NDIGC's reserves were insufficient to provide the $30,000 insurance for each certificate holder. The Department required each NDIGC member depository to display a sign at its place of business, stating that the depository was a member of NDIGC which guaranteed each certificate of indebtedness to a limit of $30,000.

On February 13, 1981, the Department's third examination of Commonwealth showed the industrial's insufficient paid-up capital in violation of § 8-403.02 and excessive insider loans.

In March of 1982, the Department's fourth examination disclosed that Commonwealth was insolvent, and the Department took supervisory control of Commonwealth. In December 1982, after its fifth examination of Commonwealth, the Department continued its supervisory control.

On March 10, 1983, the Federal Bureau of Investigation informed the Department that Commonwealth and its officers were involved in fraudulent loan activities. In June, the Department appointed a special prosecutor to investigate alleged criminal activities involving Commonwealth and its officers. On August 31, the Department's sixth examination showed that Commonwealth was still insolvent. It was not until October 27 that the Department notified NDIGC and NDIGC's member depositories concerning the Commonwealth problem.

The Department took possession of Commonwealth's assets on November 1, 1983, and decided to liquidate Commonwealth. In view of claims against

Commonwealth—claims which exceeded NDIGC's assets—all NDIGC assets were turned over to the court-appointed receiver for Commonwealth, resulting in NDIGC's collapse and leaving SSS without insurance coverage for its customers' certificates of indebtedness. After November 1, 1983, the Department prohibited withdrawal of unmatured certificates of indebtedness from all industrials, but did not restrict withdrawal of matured certificates. Absence of deposit insurance caused concern to holders of SSS' certificates of indebtedness. SSS' certificate holders withdrew their matured certificates of indebtedness, producing an SSS loss of nearly $19 million in withdrawn customer accounts. Customer accounts of $31.2 million were frozen at SSS. On December 19, SSS applied for deposit insurance coverage with Federal Savings & Loan Insurance Corporation (FSLIC). When, on July 9, 1984, FSLIC had not approved SSS' application for insurance, SSS filed for protection and reorganization under federal bankruptcy law at a reorganizational cost of $260,000.

## FIRST THEORY OF RECOVERY

SIC claims that the Department was "willfully and wantonly negligent" in its conduct involving Commonwealth, such as the Department's general failure to enforce Nebraska banking laws, take remedial action concerning Commonwealth or place Commonwealth in receivership, remove Commonwealth's officers, inform other industrials about Commonwealth's unsound financial position and later insolvency, exercise due care in supervisory control of Commonwealth after March 1982, require commercial reinsurance by NDIGC, and freeze matured certificates of indebtedness after Commonwealth closed. SIC also alleged that the Department was negligent in approving Commonwealth's membership in NDIGC and authorizing NDIGC's increase of insurance on accounts at member depositories.

## DISCRETIONARY FUNCTION

Regarding SIC's negligence claim, the first question is whether the Department's allegedly negligent conduct was a discretionary function excepted from tort liability under § 81-8,219(1)(a), which provides that the State Tort Claims Act does not apply to "[a]ny claim . . . based upon the exercise or

performance or the failure to exercise or perform a discretionary function or duty on the part of a state agency or an employee of the state, whether or not the discretion be abused."

Performance of or failure to perform a discretionary function cannot be the basis for liability under the State Tort Claims Act. *Wickersham v. State*, 218 Neb. 175, 354 N.W.2d 134 (1984); *Fletcher v. State*, 216 Neb. 342, 344 N.W.2d 899 (1984). Cf. *Allen v. County of Lancaster*, 218 Neb. 163, 352 N.W.2d 883 (1984) (discretionary function exception of the Political Subdivisions Tort Claims Act, Neb. Rev. Stat. § 23-2409(2) (Reissue 1977)).

In *Wickersham, supra*, the State adopted regulations of the U.S. Department of Agriculture concerning brucellosis examination and reporting, requiring the State to notify the owner of any herd discovered, through State testing, to be exposed to brucellosis. The State discovered brucellosis in a herd owned by Peddicord, a cattle rancher. Wickersham, another rancher, bought 17 head of Peddicord's heifers, but the State failed to inform Wickersham concerning the brucellosis infection in Peddicord's herd. By the time Wickersham learned about the brucellosis, it was too late to protect Wickersham's entire herd from brucellosis carried by the Peddicord cattle. Wickersham sued the State for its negligence. The State argued that the discretionary function exception of the State Tort Claims Act exempted its conduct from negligence liability. In rejecting the State's argument, the *Wickersham* court stated:

> That which is protected under the State Tort Claims Act, § 81-8,219(1)(a), is the discretion of a governmental executive or administrator to act according to one's judgment of the best course to be taken. Such discretion includes more than the initiation of programs and activities. Discretion includes determinations or judgments made in establishing plans, specifications, or schedules of operations. Where policy judgment exists, there also exists discretion exempted from liability under the State Tort Claims Act. . . .

> However, the discretionary function or duty exemption in the State Tort Claims Act extends only to the basic

policy decisions made in governmental activity, and not to ministerial activities implementing such policy decisions. [Citations omitted.] In other words, the State is liable for negligence of its employees at the operational level, where there is no room for policy judgment. [Citation omitted.]

In Wickersham's case there is no attempt to impose liability on the State for a policy judgment. The State's acquisition and accumulation of specific information about the dangerous and contagious disease brucellosis are activities conducted as part of the official brucellosis program in Nebraska. The duty of immediate notification to a Nebraska herd owner is imposed by the regulations under which the State was operating. . . . [T]he State's conduct in response to the discovery of brucellosis cannot be characterized as formulation of policy, planning, or discretionary action. The activity of the State moved from the province of planning into the realm of reality by the State's executing a duty imposed by the regulations. It may be that the State's conduct will eventually be evaluated in terms of the specific standards and regulations for the brucellosis eradication program. The State's action or inaction in response to detected brucellosis involved a State operational task governed by recognized regulations. At that point policy had long since passed from the picture.

218 Neb. at 180-81, 354 N.W.2d at 138-39.

The *Wickersham* court reversed a summary judgment against Wickersham, which was granted on the basis of the discretionary function exception in the State Tort Claims Act.

Four years after *Wickersham*, in *Berkovitz by Berkovitz v. U.S.*, _____ U.S. _____, 108 S. Ct. 1954, 100 L. Ed. 2d 531 (1988), the Supreme Court interpreted the discretionary function exception of the Federal Tort Claims Act, 28 U.S.C. § 2680(a) (1982), which is the pattern and substantial counterpart of Nebraska's State Tort Claims Act, including the discretionary function exception. Kevan Berkovitz ingested an oral polio vaccine, Orimune, manufactured by Lederle Laboratories, and within 1 month contracted polio, which left Berkovitz paralyzed. Berkovitz sued the United States, alleging

that the Division of Biologic Standards, a federal agency now within the Food and Drug Administration, had licensed Lederle to produce the vaccine in the absence of compliance with federal law regarding inspection and approval of polio vaccines. Berkovitz claimed that the FDA had violated its own policy of testing all polio vaccines for compliance with safety standards and allowed polio vaccines to be marketed without testing. The Court held that Berkovitz' claim was not barred by the discretionary function exception and noted: " '[I]t is the nature of the conduct, rather than the status of the actor that governs whether the discretionary function exception applies in a given case.' " 108 S. Ct. at 1958 (quoting *United States v. Varig Airlines*, 467 U.S. 797, 104 S. Ct. 2755, 81 L. Ed. 2d 660 (1984)). The Court then described the conduct which is within the discretionary function exception:

> In examining the nature of the challenged conduct, a court must first consider whether the action is a matter of choice for the acting employee. This inquiry is mandated by the language of the exception; conduct cannot be discretionary unless it involves an element of judgment or choice. See *Dalehite v. United States*, 346 U.S. 15, 34, 73 S.Ct. 956, 967, 97 L.Ed. 1427 (1953) (stating that the exception protects "the discretion of the executive or the administrator to act according to one's judgment of the best course"). Thus, the discretionary function exception will not apply when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow. In this event, the employee has no rightful option but to adhere to the directive. And if the employee's conduct cannot appropriately be the product of judgment or choice, then there is no discretion in the conduct for the discretionary function exception to protect. Cf. *Westfall v. Erwin*, 484 U.S. ____, ____, 108 S.Ct. 580, ____, 98 L.Ed.2d 619 (1988) (recognizing that conduct cannot be discretionary if prescribed by law).

> Moreover, assuming the challenged conduct involves an element of judgment, a court must determine whether that judgment is of the kind that the discretionary function exception was designed to shield. The basis for the

discretionary function exception was Congress' desire to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *United States v. Varig Airlines, supra*, at 814, 104 S.Ct., at 2764-2765. The exception, properly construed, therefore protects only governmental actions and decisions based on considerations of public policy. See *Dalehite v. United States, supra*, at 36, 73 S.Ct., at 968 ("Where there is room for policy judgment and decision there is discretion"). In sum, the discretionary function exception insulates the Government from liability if the action challenged in the case involves the permissible exercise of policy judgment.

108 S. Ct. at 1958-59.

The Court in *Berkovitz* rejected the government's argument that "the exception precludes liability for any and all acts arising out of the regulatory programs of federal agencies." *Id.* at 1959-60. In rejecting the government's argument for "regulatory function immunity," the Court stated:

That argument is rebutted first by the language of the exception, which protects "discretionary" function, rather than "regulatory" functions. The significance of Congress' choice of language is supported by the legislative history. As this Court previously has indicated, the relevant legislative materials demonstrate that the exception was designed to cover not all acts of regulatory agencies and their employees, but only such acts as are "discretionary" in nature. [Citation omitted.] This coverage accords with Congress' purpose in enacting the exception: to prevent "[j]udicial intervention in . . . the political, social, and economic judgments" of governmental—including regulatory—agencies. [Citation omitted.] Moreover, this Court twice before has rejected a variant of the Government's position. See *Indian Towing Co. v. United States*, 350 U.S. 61, 64-65, 76 S.Ct. 122, 124, 100 L.Ed. 48 (1955) (disapproving argument that FTCA precludes liability for the performance of "uniquely governmental functions");

*Rayonier, Inc. v. United States*, 352 U.S. 315, 318-319, 77 S.Ct. 374, 376-377, 1 L.Ed.2d 354 (1957) . . . .
108 S. Ct. at 1960. Cf., *United States v. Varig Airlines, supra* (discretionary function exception protected FAA decision to use spot inspections to verify compliance with federal safety standards for aircraft and evaluate actions of FAA employees in making the spot safety inspections); *Dalehite v. United States*, 346 U.S. 15, 73 S. Ct. 956, 97 L. Ed. 1427 (1953) (discretionary function exception protected governmental decision to manufacture and transport fertilizer-grade ammonium nitrate, a known explosive).

Thus, we conclude that applicability of the discretionary function exception in the State Tort Claims Act depends on the conduct in question, not on the identity of the actor. The discretionary function exception of the State Tort Claims Act includes a governmental regulatory agency and its action, conduct, and decisions. Judgment or choice is essential and indispensable for discretionary conduct excepted from negligence liability under the State Tort Claims Act. The discretionary function exception of the State Tort Claims Act protects or excepts only governmental decision, action, or conduct based on a permissible exercise of a public policy judgment. The discretionary function exception is inapplicable to a claim under the State Tort Claims Act if a statute, regulation, or policy specifically prescribes a course of governmental action or conduct. *Wickersham v. State*, 218 Neb. 175, 354 N.W.2d 134 (1984). See *Berkovitz by Berkovitz v. U.S.*, ____ U.S. ____, 108 S. Ct. 1954, 100 L. Ed. 2d 531 (1988).

SIC does not allege that the Department was negligent in its examinations of Commonwealth between 1979 and 1983 or that the Department was negligent in gathering information about Commonwealth or by failing to examine Commonwealth at regular intervals. SIC's allegations relate to the Department's conduct in the light of information received through departmental examinations of Commonwealth's operations. Consequently, SIC claims that the Department was negligent in its use, or failure to use, information obtained concerning Commonwealth's operations and financial condition.

SIC asserts numerous contentions regarding the Department's allegedly negligent conduct in handling the Commonwealth matter which led to NDIGC's collapse and injury to industrial loan and investment companies, namely, the Department negligently: (1) breached its duty to enforce Nebraska banking laws by ignoring Commonwealth's persistent violations of banking laws; (2) failed to place Commonwealth in receivership at the earliest convenient date; (3) failed to remove Commonwealth's officers despite the Department's knowledge that the officers were involved in fraudulent loan activity; (4) approved Commonwealth's membership in NDIGC; (5) approved NDIGC's increase in insurance coverage for accounts in member depositories; (6) failed to require commercial reinsurance by NDIGC; (7) failed to freeze matured certificates of indebtedness after Commonwealth closed and NDIGC collapsed; and (8) failed to inform industrial loan and investment companies about Commonwealth's precarious financial position.

At the outset, we note that, while the Department is obligated to enforce Nebraska banking laws, §§ 8-102 and 8-401.01, the Department is nevertheless vested with broad discretion to determine the method and manner of enforcing state banking laws. See, e.g., *Bartlett v. State Real Estate Commission*, 188 Neb. 828, 199 N.W.2d 709 (1972) (a governmental agency's method and manner of enforcing the law must be left to the discretion of proper agency or administrative officers). Public policy considerations necessarily operate whenever the Department decides or attempts to discern what action is appropriate in the light of allegations concerning improper operation of a financial institution. Dissemination of information concerning Commonwealth's precarious financial condition would likely have had a widespread adverse impact on the industrial loan and investment industry in Nebraska—a situation which the Department undoubtedly desired to avoid or minimize. While the Department was obligated to perform some functions in its supervision of the financial industry, e.g., § 21-17,139(3) (report to NDIGC), supervision of industrial loan and investment companies is generally accomplished by entrusting

such matters to the discretion of the Department.

Without further discussion of the specific acts of negligence enumerated above, we conclude that each of SIC's allegations concerns matters within the discretion of the Department. While the Department is statutorily empowered to perform each of its specified tasks mentioned in SIC's allegations, none of the statutes which is the basis for SIC's allegations of negligence requires the Department to execute any of its authorized powers. Furthermore, the Department's discretion concerning the proper course of conduct in reference to Commonwealth's insolvency is guided and influenced by important considerations of public policy. SIC's allegations of the Department's negligence are within the purview of the discretionary function exception of the State Tort Claims Act and, therefore, are not actionable under the State Tort Claims Act. Accord, *Emch v. United States*, 630 F.2d 523 (7th Cir. 1980) (failure of bank regulators to anticipate financial difficulties of a particular bank, to ensure the honesty and competency of bank officers, and to successfully prevent losses to shareholders are within the discretionary function exception of the Federal Tort Claims Act); *Huntington Towers, Ltd. v. Franklin Nat. Bank*, 559 F.2d 863 (2d Cir. 1977) (comptroller's decision to close an insolvent bank is a discretionary act).

The district court correctly sustained the Department's demurrer to SIC's "First Theory of Recovery" based on negligence.

### SECOND THEORY OF RECOVERY

SIC contends that equitable estoppel precludes the Department's denying any obligation because, in its duty to supervise industrials and NDIGC, the Department impliedly promised protection of $30,000 for each certificate of indebtedness of an industrial loan and investment company. In the language of SIC's petition, the Department "knowingly concealed material facts regarding the financial stability and management of Commonwealth," a situation unknown to SIC and its assignor, SSS. According to SIC, the Department's implied promise to insure an industrial's certificates of indebtedness, coupled with concealment of Commonwealth's condition, induced SIC to forbear obtaining alternate deposit

insurance.

As expressed in *L. J. Vontz Constr. Co. v. State*, 230 Neb. 377, 382, 432 N.W.2d 7, 11 (1988): "[A] court must examine and construe a petition's essential and factual allegations by which the plaintiff requests relief, rather than the legal terminology utilized in the petition or the form of a pleading."

The doctrine of equitable estoppel is not a cause of action, but is a judicial device to preserve a right already acquired, not generate a new right. *Warren v. Papillion School Dist. No. 27*, 199 Neb. 410, 259 N.W.2d 281 (1977); *Clark & Enersen, Hamersky, S., B. & T., Inc. v. Schimmel Hotels Corp.*, 194 Neb. 810, 235 N.W.2d 870 (1975); *State v. Bardsley*, 185 Neb. 629, 177 N.W.2d 599 (1970).

Rather than allegations of equitable estoppel, SIC's second theory of recovery contains allegations that "the Department knowingly concealed material facts" about Commonwealth, SIC "reasonably relied on the . . . Department's . . . concealment of material facts," and "[a]s a direct result of [SIC's] reasonable reliance upon . . . the concealment of Commonwealth's condition by the State and the Department," SIC was injured.

> *Conceal* means to hide, secrete, or withhold from knowledge of others; to withhold from utterance or declaration; to cover or keep from sight; to hide or withdraw from observation, cover or keep from sight, or prevent discovery. *Christopher v. Evans*, 219 Neb. 51, 361 N.W.2d 193 (1985). The word *conceal* pertains to affirmative action likely to prevent or intended to prevent knowledge of a fact and has reference to some advantage to the concealing party or a disadvantage to some interested party from whom the fact is withheld. *Christopher v. Evans, supra.*

*State v. Copple*, 224 Neb. 672, 691, 401 N.W.2d 141, 155 (1987).

In *Nelson v. Cheney*, 224 Neb. 756, 762, 401 N.W.2d 472, 476-77 (1987), this court specified the elements of fraud by concealment:

> (1) that the defendant concealed or suppressed a material fact; (2) that the defendant had knowledge of this material

fact; (3) that this material fact was not within the reasonably diligent attention, observation, and judgment of the plaintiff; (4) that the defendant suppressed or concealed this fact with the intention that the plaintiff be misled . . . (5) that the plaintiff was reasonably so misled; and (6) that the plaintiff suffered damage as a result.

Examining SIC's petition in terms of essential and factual allegations, we conclude that SIC's cause of action against the Department is based on the Department's alleged concealment of Commonwealth's unsound financial condition. While § 21-17,141 provides that certain parties, including the Department, may be held liable only for "willful, wanton, or fraudulent" acts in connection with the NDIGC Act, the State Tort Claims Act precludes the Department's liability based on misrepresentation or deceit. See § 81-8,219(1)(d). Does § 21-17,141, which provides for the Department's liability under the Nebraska Depository Institution Guaranty Corporation Act, waive the State's common-law immunity from suit?

"Waiver [of sovereign immunity] will only be found 'where stated "by the most express language or by such overwhelming implications from the text as [will] leave no room for any other reasonable construction." ' " *Wiseman v. Keller*, 218 Neb. 717, 720, 358 N.W.2d 768, 770 (1984) (quoting *Edelman v. Jordan*, 415 U.S. 651, 94 S. Ct. 1347, 39 L. Ed. 2d 662 (1974)).

Section 21-17,141 is not a waiver of common-law governmental immunity. Section 21-17,141 imposes tort liability on certain defendants, many of whom are not protected by sovereign immunity, for conduct which is "willful, wanton, or fraudulent" and provides a shield from liability which might otherwise be imposed for negligent conduct. Tort liability of the State, pursuant to § 21-17,141, is controlled by the State Tort Claims Act, which grants the right to sue the state for its "negligent or wrongful act or omission." See § 81-8,210(4). Under § 81-8,219(1)(d) of the State Tort Claims Act, the State is not liable for misrepresentation or deceit. Fraud by concealment is a form of deceit and conduct for which the State is immune from liability under the State Tort Claims Act. SIC's "Second Theory of Recovery" fails to state a cause

of action against the Department. The district court correctly sustained the Department's demurrer.

## CONCLUSION

Referring to the discretionary function exception under the Federal Tort Claims Act, the Supreme Court, in *Berkovitz by Berkovitz v. U.S.*, ____ U.S. ____, 108 S. Ct. 1954, 1960, 100 L. Ed. 2d 531 (1988), observed that the exception

> was designed to cover not all acts of regulatory agencies and their employees, but only such acts as are "discretionary" in nature. . . . This coverage accords with Congress' purpose in enacting the exception: to prevent "[j]udicial intervention in . . . the political, social, and economic judgments" of governmental—including regulatory—agencies.

We believe that the Supreme Court's observations about the discretionary function exception of the Federal Tort Claims Act, examined in *Berkovitz*, are appropriate in describing this court's role in relation to the discretionary function exception prescribed by § 81-8,219(1)(a) of the State Tort Claims Act—prevention of judicial intervention in the political, social, and economic judgments of the government, including its regulatory agencies.

SIC failed to state a cause of action under the State Tort Claims Act. The district court properly sustained the demurrer to SIC's petition and dismissed SIC's action against the Department (State of Nebraska).

AFFIRMED.