FIRST NATIONAL BANK OF OMAHA, A NATIONAL BANKING
CORPORATION, APPELLANT, V. STATE OF NEBRASKA, APPELLEE.
488 N.W.2d 343

Filed August 21, 1992.    No. S-89-844.

James B. Cavanagh, of Lieben, Dahlk, Whitted, Houghton & Jahn, P.C., and, on brief, Thomas J. Culhane, of Erickson & Sederstrom, P.C., for appellant.

Robert M. Spire, Attorney General, and Charles E. Lowe for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

CAPORALE, J.

The district court sustained the demurrer of the defendant-appellee, State of Nebraska, to the third amended petition filed by the plaintiff-appellant, First National Bank of Omaha, and dismissed the suit. First National has appealed, asserting, in summary, that the district court erred in concluding that it failed to state a cause of action. We affirm.

First National instituted its suit under the provisions of the State Tort Claims Act, Neb. Rev. Stat. § 81-8,209 et seq. (Reissue 1987). In *First Nat. Bank of Omaha v. State*, 230 Neb. 259, 430 N.W.2d 893 (1988) (*First Nat. Bank of Omaha I*), this court affirmed the sustainment of the State's demurrer, but reversed the order of dismissal, writing that "it is reasonably possible that [First National] may be able to state a cause of action in support of its theory of recovery." *Id.* at 268, 430 N.W.2d at 900. First National thereafter filed an amended petition, and the State again successfully demurred. First National responded by filing the petition which is the subject of this appeal.

The subject petition alleges that in April 1980, First National entered into several loan agreements with James and Nancy Gillette and two corporations the Gillettes controlled, Beatrice State Company and Olympic Investment Company. The proceeds from the loans were used to purchase the stock of First Security Bank and Trust Company of Beatrice, a state-chartered bank, and First Security Savings of Beatrice, a state-chartered industrial loan and investment company. First National took possession of the stock as collateral for the loans.

Because the loans became delinquent and both Security Bank and Security Savings were on the verge of insolvency, First

National notified the Nebraska Department of Banking and Finance that it intended to dispose of the stock it held as collateral at a public sale. The financial problems of Security Bank and Security Savings "were primarily due to a number of non-performing loans" the two institutions had made to "Newt Copple of Lincoln, Nebraska, or his associates or related entities." As of April 8, 1983, Newt Copple was indebted to Security Bank in the amount of $1,181,661 and to Security Savings in the amount of $1,537,308.08.

The department attempted to dissuade First National from selling the stock and encouraged it instead to take over both Security Bank and Security Savings. First National rejected that proposal and, on March 25, 1983, sent potential buyers notice that the stock would be sold.

In the meantime, on or about March 10, 1983, the department had received written notice from the Federal Bureau of Investigation in regard to "what appeared to be criminal conduct in the form of fraudulent loan transactions involving [Security Bank]." The bureau also advised that it "had information indicating that there had been similar fraudulent loan transactions involving Commonwealth Savings Company, a state chartered industrial loan and investment company, and S. E. Copple." At no time did the department make First National aware of this letter or of its contents.

On April 1, 1983, the department's director held a meeting with S.E. Copple, representatives of First National, the Gillettes, and the Nebraska Depository Institution Guarantee Corporation, among others. The director proposed that First National acquire Security Bank and Security Savings and accept the stock of those corporations in satisfaction of the loans. It was also proposed that Security Bank and Security Savings lend S.E. Copple "sufficient funds to permit him to purchase the Newt Copple loans from their respective institutions . . . ." The guarantee corporation "would make a capital contribution of $200,000.00 to [Security Savings] and provide a guarantee in the amount of $680,000.00 against further losses . . . ."

On April 8, 1983, First National entered into an agreement with its borrowers which incorporated the elements proposed at

the April 1 meeting. However, the agreement was contingent upon S.E. Copple's purchase of Newt Copple's loans "on terms and conditions acceptable to the Banking Department"; the guarantee corporation's agreeing to the proposed advances and guarantees; the department's assuring First National of "the capital adequacy of, quality of assets in, and absence of violations of law by both [Security Bank] and [Security Savings]"; and the department's approval of the agreement. These conditions were met, and First National thereafter acquired Security Bank and Security Savings. Immediately after acquiring the two institutions, First National announced that it would stand behind their obligations. However, had First National been properly informed of the condition of Security Bank or Security Savings, it would not have acquired them.

S.E. Copple, as "a direct and proximate result of a long standing course of fraudulent and illegal lending practices engaged in between he [sic] and other members of his family and Commonwealth Savings Company," later defaulted "on the promissory notes he had given [Security Bank] and [Security Savings] to purchase the Newt Copple loans."

The subject petition concludes that the department was negligent in (1) failing to investigate the allegations of misconduct by S.E. Copple; (2) failing to conduct periodic examinations of Security Bank, Security Savings, and Commonwealth Savings; (3) approving the S.E. Copple loans when it knew or should have known it lacked adequate information; (4) approving the agreement of merger when it lacked adequate information; (5) providing assurances that Security Bank and Security Savings were stable; (6) failing to conduct periodic examinations of Security Bank as permitted by Neb. Rev. Stat. § 8-108 (Reissue 1991); (7) failing to conduct periodic examinations of Security Savings and Commonwealth Savings as required by Neb. Rev. Stat. § 8-401 (Reissue 1991); and (8) failing to advise First National of the alleged fraudulent conduct involving S.E. Copple and Commonwealth Savings.

We begin our analysis by recalling that when ruling on a demurrer, a court must assume that the pleaded facts, as distinguished from legal conclusions, are true as alleged and must give the pleading the benefit of any reasonable inference

from the facts alleged, but cannot assume the existence of a fact not alleged, make factual findings to aid the pleading, or consider evidence which might be adduced at trial. *Crow v. Giebelhaus, ante* p. 4, 486 N.W.2d 207 (1992); *Whorley v. First Westside Bank*, 240 Neb. 975, 485 N.W.2d 578 (1992); *Pappas v. Sommer*, 240 Neb. 609, 483 N.W.2d 146 (1992). A petition will be sufficient if, under the facts alleged, the law entitles a plaintiff to recover. See *Matheson v. Stork*, 239 Neb. 547, 477 N.W.2d 156 (1991). That is to say, facts are sufficient to constitute a cause of action when they are a narrative of the events, acts, and things done or omitted which show a legal liability of the defendant to the plaintiff. *Id.*

The gravamen of First National's position is that by fostering and approving the agreement resulting from the April 1 meeting, the department undertook a self-imposed duty to act with due care, but instead acted negligently, to First National's detriment.

In support of this position, First National argues, in part, that in determining that it had failed to state a cause of action, the district court erred by failing to apply the law of the case as announced in *First Nat. Bank of Omaha I.* The law of the case doctrine teaches that the holdings of an appellate court on questions presented to it in reviewing the proceedings of the trial court become the law of the case; those holdings conclusively settle, for the purpose of that litigation, all matters ruled upon, either expressly or by necessary implication. See *Bass v. Dalton*, 218 Neb. 379, 355 N.W.2d 225 (1984).

In this regard, First National postulates, in essence, that by observing in *First Nat. Bank of Omaha I* that it was reasonably possible that First National might be able to state a cause of action; that one who, without an obligation to act, nonetheless undertakes to act must do so with reasonable care; and that the State Tort Claims Act recognizes a cause of action based upon the breach of a statutory or common-law duty, this court ruled that a cause of action had arisen under the act. Such, however, is not the fact.

*First Nat. Bank of Omaha I* held only that as the petition under consideration was confusing, the district court should have granted First National an opportunity to replead. In no

sense did *First Nat. Bank of Omaha I* rule that First National possessed a cause of action.

In continuing its argument, First National recognizes that the act waives the State's sovereign immunity with respect to certain, but not all, types of tort actions. See, *Wickersham v. State*, 218 Neb. 175, 354 N.W.2d 134 (1984); *Fletcher v. State*, 216 Neb. 342, 344 N.W.2d 899 (1984). Section 81-8,219 reads, in relevant part, that its operating provisions shall not apply to any claim

> (a) . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a state agency or an employee of the state, whether or not the discretion be abused;
>
> . . . .
>
> (d) . . . arising out of . . . misrepresentation . . . .

However, First National urges that its effort at recovery is defeated neither by the discretionary function exemption nor by the misrepresentation exception.

We recently treated the discretionary function exemption in another suit involving the department, *Security Inv. Co. v. State*, 231 Neb. 536, 437 N.W.2d 439 (1989). The plaintiff therein alleged that as the result of the department's negligent monitoring of another industrial loan and investment institution, the plaintiff had lost its deposit insurance and customer accounts and, as a consequence, was obligated to undergo reorganization under the provisions of the federal Bankruptcy Act. In determining that the plaintiff's claims regarding the department's regulatory activities were barred by the discretionary function exemption, we observed that the

> applicability of the discretionary function exception in the State Tort Claims Act [§ 81-8,209 et seq.] depends on the conduct in question, not on the identity of the actor. The discretionary function exception of the State Tort Claims Act includes a governmental regulatory agency and its action, conduct, and decisions. Judgment or choice is essential and indispensable for discretionary conduct excepted from negligence liability under the State Tort Claims Act. The discretionary function exception of the State Tort Claims Act protects or excepts only

governmental decision, action, or conduct based on a permissible exercise of a public policy judgment. The discretionary function exception is inapplicable to a claim under the State Tort Claims Act if a statute, regulation, or policy specifically prescribes a course of governmental action or conduct.

231 Neb. at 546, 437 N.W.2d at 446.

We specifically found that while Neb. Rev. Stat. § 8-102 (Reissue 1991) and § 8-401 empower the department to supervise and control banks and industrial loan and investment companies, "none of the statutes . . . requires the [d]epartment to execute any of its authorized powers." 231 Neb. at 548, 437 N.W.2d at 447. Moreover, we noted that the department's course of conduct in such cases is guided by "important considerations of public policy." *Id*. Cf. *Wickersham v. State, supra*; *Koepf v. County of York*, 198 Neb. 67, 251 N.W.2d 866 (1977).

The U.S. Supreme Court in *U.S. v. Gaubert*, _____ U.S. _____, 111 S. Ct. 1267, 113 L. Ed. 2d 335 (1991), recently applied the same reasoning with respect to the discretionary function exemption of the Federal Tort Claims Act, as did the *Security Inv. Co.* court with respect to the State Tort Claims Act. The Home Owners' Loan Act of 1933 authorized the Federal Home Loan Bank Board, " 'under such rules and regulations as it may prescribe, to provide for the organization, incorporation, examination, operation, and regulation' " of federal savings and loan associations. 111 S. Ct. at 1271. See 12 U.S.C. § 1464(a) (1988). Gaubert, the largest shareholder and chairman of the board of Independent American Savings Association, alleged that the bank board and the Federal Home Loan Bank-Dallas negligently carried out their supervisory functions in managing the day-to-day functions of Independent American. The bank board attempted to have Independent American merge with Investex Savings, a failing Texas thrift institution. In order to facilitate the merger, the bank board and the loan bank had Gaubert removed from the management team of Independent American and had him post a "$25 million interest in real property as security for his personal guarantee that [Independent American's] net worth would exceed

regulatory minimums." 111 S. Ct. at 1272. Thereafter, the bank board and the loan bank recommended that Independent American hire certain individuals in management and consultative positions, mediated salary disputes, interfered with the Texas savings and loan department's attempts to oversee Independent American, and managed other of Independent American's day-to-day affairs. Prior to the involvement of the bank board and the loan bank, Independent American was considered a financially sound institution; however, under the government regulators, it was announced that Independent American "had a substantial negative net worth." *Id.* Independent American thereafter sustained a $75 million loss in share value, and Gaubert lost $25 million in real property. Gaubert then filed an action under the Federal Tort Claims Act, 28 U.S.C. § 2671 et seq. (1988).

The U.S. Supreme Court ruled that Gaubert's claims were barred by the discretionary function exemption of 28 U.S.C. § 2680(a) (1988):

> [I]f a regulation mandates particular conduct, and the employee obeys the direction, the Government will be protected because the action will be deemed in furtherance of the policies which led to the promulgation of the regulation. . . . If the employee violates the mandatory regulation, there will be no shelter from liability because there is no room for choice and the action will be contrary to policy. On the other hand, if a regulation allows the employee discretion, the very existence of the regulation creates a strong presumption that a discretionary act authorized by the regulation involves consideration of the same policies which led to the promulgation of the regulations.
>
> . . . .
>
> When established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion.

111 S. Ct. at 1274.

The *Gaubert* Court observed, further, that decisions "made

at the operational or management level of [Independent American] involved in this case" were exempted from liability. 111 S. Ct. at 1275. The Court refused to limit application of the exemption only to those discretionary acts made in a policymaking or planning context:

> Day-to-day management of banking affairs, like the management of other businesses, regularly require [sic] judgment as to which of a range of permissible courses is the wisest. Discretionary conduct is not confined to the policy or planning level. "[I]t is the nature of the conduct, rather than the status of the actor, that governs whether the discretionary function exception applies in a given case." *Varig Airlines, supra,* at 813, 104 S.Ct., at 2764.

111 S. Ct. at 1275. Thus, the *Gaubert* Court concluded operational level decisions made on the basis of a statute giving broad powers are not necessarily outside the discretionary function exemption. We agree.

The regulatory statutes which First National claims the department violated, §§ 8-108 and 8-401, merely give the department the power to examine the books of state banks and savings institutions. Granted, § 8-401 requires the department to examine, at least annually, industrial loan and investment companies, but the statute does not require the department to respond to its findings in any specified manner. Hence, these statutes do nothing more than provide the vehicle by which the department may oversee state-chartered banks and savings institutions.

The department's involvement in the merger of Security Bank and Security Savings with First National may have involved operational or managerial decisions, but, as illustrated by the *Gaubert* analysis, those decisions were discretionary. The department's efforts to facilitate First National's purchase of Security Bank and Security Savings by actively participating in the negotiations and drafting the agreements may have been operational acts, but they were based on broad statutory directives. As the U.S. Supreme Court observed, "If the routine or frequent nature of a decision were sufficient to remove an otherwise discretionary act from the scope of the exception, then countless policy-based decisions by regulators exercising

day-to-day supervisory authority would be actionable. This is not the rule of our cases." 111 S. Ct. at 1279.

Since the department's actions in this instance were discretionary and the discretionary function exemption applies "whether or not the discretion be abused," § 81-8,219(a), we need not determine whether the misrepresentation exemption of the act applies as well.

Inasmuch as First National has pled facts establishing that the department's actions fall within the discretionary function of the act, the district court correctly dismissed First National's suit.

AFFIRMED.

WHITE, J., not participating in the decision.