SEAN THOMAS JASA, BY AND THROUGH HIS FATHER, MOTHER, AND NEXT FRIENDS, STEPHEN SCOTT JASA AND IVY JO JASA, APPELLEE, v. DOUGLAS COUNTY, A NEBRASKA POLITICAL SUBDIVISION, APPELLANT.

510 N.W.2d 281

Filed January 21, 1994.    No. S-91-970.

James S. Jansen, Douglas County Attorney, and Michael W. Amdor for appellant.

William J. Elder and Michael McCormack, of McCormack, Cooney, Mooney, Hillman & Elder, for appellee.

Vard R. Johnson and Robert W. Kortus, of Broom, Johnson, Fahey & Clarkson, for amicus curiae Nebraska Association of County Officials.

J. Patrick Green and E. Terry Sibbernsen for amicus curiae Amicus Curiae Committee of the Nebraska Association of Trial Attorneys.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, FAHRNBRUCH, and LANPHIER, JJ., and GRANT, J., Retired.

CAPORALE, J.

## I. STATEMENT OF CASE

The minor appellee, Sean Thomas Jasa, by and through his parents (father Stephen Scott Jasa and mother Ivy Jo Jasa) acting as his next friends, brought this action under the provisions of the Political Subdivisions Tort Claims Act, Neb. Rev. Stat. § 13-901 et seq. (Reissue 1991), against the appellant, Douglas County, alleging that through the failure of its department of health to take appropriate steps with respect to

the presence of bacterial meningitis, an infectious disease, in the population of West Omaha Day Care and Nursery School, Inc., a day-care facility, the county negligently caused said minor to suffer permanent and catastrophic disability. The district court entered judgment against the county. In challenging the judgment, the county assigns a number of errors, including that the district court incorrectly determined that liability is not foreclosed by the discretionary function exemption of the act. The record sustaining that assignment, we, without reaching the other claimed errors, reverse the judgment and remand the cause with the direction that it be dismissed.

## II. SCOPE OF REVIEW

The essence of the minor's claim is that the county department was negligent in its admitted failure to determine that there had been a case of bacterial meningitis at West Omaha Day Care and its failure to inform his parents of the presence of the disease at that facility.

While § 13-908 makes a political subdivision such as the county liable for an action in tort "in the same manner and to the same extent as a private individual under like circumstances," § 13-910(2) exempts a political subdivision from liability on any claim "based upon the exercise or performance of or the failure to exercise or perform a discretionary function or duty on the part of the political subdivision or an employee of the political subdivision, whether or not the discretion be abused." Thus, the performance or nonperformance of a discretionary function cannot be the basis of liability under the act. *Lemke v. Metropolitan Utilities Dist.*, 243 Neb. 633, 502 N.W.2d 80 (1993).

We have held that whether the undisputed facts demonstrate that liability is precluded by the discretionary function exemption of the Political Subdivisions Tort Claims Act is a question of law. See *id*. See, also, *Blitzkie v. State*, 241 Neb. 759, 491 N.W.2d 42 (1992). Regarding a question of law, an appellate court has an obligation to reach a correct conclusion independent of that reached by the court below. *Transamerica Commercial Fin. Corp. v. Rochford, ante* p. 802, 509 N.W.2d 214 (1993); *Metropolitan Life Ins. Co. v. Kissinger Farms,*

*ante* p. 620, 508 N.W.2d 568 (1993); *Lemke, supra.*

## III. NATURE OF DISEASE

According to Dr. David J. Itkin, a physician who specializes in infectious diseases, the minor's condition results from his having contracted bacterial meningitis as the consequence of his exposure to Haemophilus influenzae type b, a bacterium which can cause a variety of different diseases and is generally spread by respiratory secretions and other close contact with infected persons. The Haemophilus organism causes disease in children who have not developed their own immunity; thus, children between 3 to 6 months and 3 to 4 years of age are at the greatest risk of infection and subject to the greatest damage from the disease.

Itkin ranks Haemophilus as the most dangerous infectious organism among children 3 years of age and under in terms of communicability and the effect of the disease upon those infected.

## IV. FACTS

### 1. DEVELOPMENTS AT WEST OMAHA DAY CARE

A then 3-year-old girl enrolled at West Omaha Day Care, who last attended the facility on Friday, October 23, 1987, became ill with flu-like symptoms on Sunday, October 25, 1987. On Tuesday morning, October 27, the girl was examined in her pediatrician's office. Due to the girl's imbalance and weakness, her mother, a registered nurse, was concerned about the potential of a "massive ear infection or meningitis." However, the girl's mother said that at that time "we ruled out meningitis."

On Wednesday, October 28, the girl was again taken to her pediatrician's office. While being examined, she began to suffer rigidity in her neck; the pediatrician who examined her believed she probably had meningitis and sent her to a hospital.

Being familiar with the dangers of meningitis, the girl's mother was concerned about the children with whom the girl had had contact. Accordingly, the girl's mother called West Omaha Day Care on the 28th and informed the director that the girl was ill and was probably suffering from meningitis. The

girl's mother testified that she called the director so that the director "could alert the other parents."

The next morning, the director called the girl's mother and inquired specifically whether the girl had viral or bacterial meningitis. The girl's mother told the director that was not yet known. Either later that same day or the next day, the director called the girl's mother a second time to determine how the girl was doing and to inquire about visiting.

According to Lewis William White, the president of the corporation which owned and operated West Omaha Day Care, the director contacted the girl's mother and "asked her when she found out or heard anything more to please let us know." When the girl's mother did not call back in the next couple of days, White asked the staff to call her again. According to White, the girl's father was reached by a staff member at the hospital on Friday, October 30. He said meningitis was still suspected but that the tests were not yet conclusive. The staff then asked the father to let them "know as soon as possible," but received no further notification of the girl's condition. The girl's father, however, denies receiving the call White described.

The county department had informed day-care facilities of the vaccines obtainable from various sources and made available a Haemophilus factsheet to be sent to parents. The county department also provided day-care facility operators with an informational packet prepared by the Centers for Disease Control of the U.S. Public Health Service entitled "What You Should Know About Contagious Diseases in the Day Care Setting." It informs day-care facility operators how to respond to bacterial meningitis as follows:

**What to Do**

If one case of bacterial meningitis has occurred in your [facility]:

Temporarily exclude the sick child from the [facility].
Contact the child's physician[.]
Ask what germ caused the meningitis.
Contact your Health Department.
Tell them about the case of meningitis and the germ that caused it.
Ask what actions they recommend to prevent spread

of infection.

Parents of all children in the [facility] should be informed that:

They should know that their child may have been exposed to a serious contagious disease.

Their child should see a physician IMMEDIATELY if he develops fever, headache, rashes, spots, unusual behavior or other symptoms of concern.

They should know any other preventive measures the Health Department recommends.

To STOP others from getting the disease:

A child's doctor or your Health Department may recommend certain antibiotics for exposed children and adults to reduce their risk of getting bacterial meningitis.

White acknowledged he had a copy of the publication in his possession at the time of the onset of the girl's disease and admitted he did not consult it until after the minor became ill.

### 2. MINOR'S ILLNESS

The minor, who, having been born on September 24, 1986, was then just over a year old, started attending West Omaha Day Care on October 26, 1987, spending about 40 hours a week at the facility, Monday through Friday.

On Saturday morning of Thanksgiving week of that year, the minor's father noticed that the minor was a bit warm and mentioned the fact to the minor's mother. By late afternoon, the minor's temperature had risen to approximately 102.5 degrees.

The mother gave the minor some Tylenol and called his pediatrician. One of the pediatrician's partners returned the call and advised that the minor, who had a history of ear infections, might be having another ear or viral infection. The partner stated he could not prescribe any medication without an examination and advised that, if desired, the minor could be taken to an emergency care facility or the condition could be left to "run its course." The minor's parents decided to keep him at home and try to hold the temperature down with Tylenol and fluids as the partner had instructed.

Between 4 and 4:30 a.m. of the following morning, the mother checked the minor's temperature; it was steady at 102.5

degrees. However, she noticed that several areas of his body were discolored. Because of the discoloration and the minor's lethargic behavior and discomfort, the minor's parents decided to take him to the hospital for treatment. By the time they arrived at the hospital at approximately 6 a.m., the areas of discoloration had turned dark purple, and the minor also began discharging blood through his nose and mouth. After testing, he was diagnosed as having bacterial meningitis.

Dr. John Moore, the pediatrician whose office the minor's mother first contacted, explained that there is no specific symptom which in the early stages signals the presence of bacterial meningitis. However, if one suspects its presence, a lumbar puncture permits a diagnosis. He testified that if he had been informed that the minor had been exposed to bacterial meningitis, he would have treated the minor with antibiotics. When asked whether in his opinion

> to a reasonable degree of medical probability in [the minor's] situation if he would have been treated when [the mother] called [Moore's office] that there is a possibility that his injuries would have been less or he would have been better off than he was when he [was] presented to [the hospital] early the next morning?

Moore replied that he had an opinion and felt that if the minor "had gotten antibiotics at that moment, I think it could have altered the course in his favor, yes."

Itkin testified that in small populations such as at a day-care facility, there is an increased frequency of secondary cases by colonization, a process by which one exposed to the organism, although not ill, carries the organism and passes it on to another. Antibiotics may be given that "are effective in eradicating the carrier or colonization state" to interrupt the spread of Haemophilus. The key to treatment is the timeliness of diagnosis and treatment with antibiotics.

In Itkin's view, although the girl and the minor were not at West Omaha Day Care at the same time, the minor's infection was directly related to the girl's because of the colonization of the other enrollees, who eventually colonized the minor, producing his infection.

### 3. COUNTY'S ROLE

The record contains opinion evidence to the effect that the county department was negligent in failing to determine that the girl had attended West Omaha Day Care and in failing to inform the minor's parents of that fact. However, whether the undisputed facts, even if establishing negligence, demonstrate that liability is foreclosed by the discretionary function exemption is, as noted in part II above, a question of law. We thus focus upon the undisputed facts relating to the county department's conduct.

John M. Weston has been the chief of the division of clinical services for the county department since early 1987 and has been employed by the county department and its predecessor, the Omaha-Douglas County Health Department, an organization serving both the city of Omaha and the county, since 1972. Weston worked as an epidemiologist prior to assuming his present duties. According to Weston, epidemiology is "the study of the distribution of disease and other physiological conditions in human populations and [the] factors that influence that distribution." Disease control consists of the implementation of "activities that will allow for the reduction or elimination of a disease."

Since 1987, Weston has supervised and directed the county department's epidemiology and sexually transmitted disease control sections, each of which performs surveillance activities for communicable diseases in the community. He reports directly to the director of the county department, who, as the chief executive officer, reports directly to the county's board of health.

Based on similar forms used by the state Department of Health and by California, Weston, in 1981, designed a postcard reporting form. The card lists a number of reportable diseases, including bacterial meningitis, and asks for the name of the disease reported, the patient's name and address, the dates of the report and onset of the disease, the laboratory results, and the name and address of the reporting health care provider. Although the regulations of the state department did not require the reporting of bacterial meningitis, Weston included the illness to comply with an Omaha ordinance which made it

reportable.

According to Weston, the purpose of the card was to provide a means of collecting data furnishing a basis for formulating sound public health policy and good disease control measures. The card was not intended to itself trigger disease control measures, nor was it designed to collect all the information the county department needed about a particular disease. The thought was that the card would provide the information needed to enable the county department to contact people to gather such additional information as the county department might find useful.

The postcard reports of infectious diseases were also used by the county department to fill out more detailed reports on forms of the national center, which the county department then forwarded to the state department.

In answer to an interrogatory which inquired whether, as of October 1987, there was in effect "any policy or contingency plans for disseminating information regarding a reported case of bacterial meningitis to day care facilities or the parents of day care attendees," the county department replied that if it had been notified "of a case of bacterial meningitis in a day care center or in a day care attendee," then as a matter of policy some employee "would have contacted the day care center and/or the parents of the attendee, made recommendations and suggestions to them, and offered the expertise of the Department as a resource." The answer continued that no employee had "the authority to order the day care operators or the parents of attendees to do anything. The decision as to the type of response rested with the day care operators and the parents of attendees." The trial testimony explained further that it was the county department's policy to educate day-care facility operators about bacterial meningitis, to provide informational literature, to offer to assist day-care facilities in which the disease had occurred, to urge day-care operators to notify the parents of its enrollees that there had been an incident of the disease, and to offer to talk with parents who had questions. The county department had not in any instance notified the enrollees' parents of an incident of the disease at a day-care facility.

After Weston attended the first symposium on infectious diseases in the day-care setting sponsored by the national center in 1984, the county department distributed to day-care facilities the informational packet described in section 1 of this part of the opinion.

The county department received a card report dated November 2, 1987, from the hospital to which the girl had been admitted, advising that she had bacterial meningitis. The hospital reported the date of onset of the disease to be October 25, 1987, and reported that laboratory tests revealed the presence of Haemophilus. Receipt of that card caused the county department to report the incident on February 12, 1988, to the national center on a national center form with a revision date of "4-77." That revision did not inquire about day-care attendance by the infected person. However, the national center had revised the bacterial meningitis report form with forms carrying revision dates of "7-81," "10-85," and "10-86." The 1986 revision, for the first time, inquired as to whether the infected person was less than 6 years old and attended a day-care facility.

A former employee of the state department testified that if the county department wanted revisions of the national center forms, it was not to contact the national center directly but was to obtain them from the state department. However, the state department did not have a program or policy of sending the new revisions of the national center forms to the county department. Neither did the national center's weekly morbidity and mortality report make mention of the existence of revised reporting forms.

While it was the county department's policy to use the most current national center forms, it had not received the updated forms from the state, had not been told about the new forms by the state, did not have the new forms in the fall of 1987, and did not learn of the "10-86" revision until a discussion between one of the county department's employees and a state department employee in early 1988, at which time the county department began using the "10-86" revision of the form.

Indeed, in 1987, the state department itself forwarded 16 reports to the national center on the same 1977 revision used by

the county department, 5 on the 1981 revision, 7 on the 1985 revision, and 8 on the 1986 revision. Furthermore, even in 1988, the state department forwarded to the national center 1 report on the 1977 revision, 2 on the 1981 revision, 6 on the 1985 revision, and 33 on the 1986 revision.

## 4. STATE OF MEDICAL KNOWLEDGE

According to Itkin, Haemophilus has been around for a long time; the new issue is that in the day-care environment, infectious diseases have a propensity for spreading due to the close contact and intensity of exposure. When Itkin came to Omaha in 1986, physicians regarded the risk of infectious diseases in day-care facilities "with a lot of anxiety" and "recognized that [they] posed a risk and yet they recognized the controversy in establishing how much of a risk that was."

In 1987, the antibiotic rifampin was effective in eradicating Haemophilus in the carrier state in 95 percent of the cases and could be used for children under 2 years of age. However, the primary authority on which pediatricians then relied in treating infectious diseases, including Haemophilus, stated: "The risk of secondary disease occurring in [facilities] with a single case is uncertain. Moreover, the efficacy of Rifampin in preventing secondary disease in day-care groups is not well established, and the difficulties in delivering prophylaxis are considerable." This authority left permissive the administration of rifampin after a single occurrence in a day-care facility, and there was a controversy among reasonable physicians as to the efficacy of the drug at that time.

It was during that same year that the state department first began to follow up on reports of Haemophilus occurrences in day-care settings, the first such occasion occurring in October of that year. That constituted a change in the state department's practices. The change occurred because a vaccine had been licensed to protect children against the organism. Information was becoming available concerning the seriousness of the disease and the impact of day-care facilities in the spread of the disease, and health authorities were beginning to take into account the effect of the disease on public health resources.

According to the minor's pediatrician, in 1987 the

Haemophilus vaccine was not customarily given to children less than 2 years of age, but it is now given to infants as young as 2 months old.

## V. ANALYSIS

We begin our analysis by noting that the discretionary function exemption is expressed in nearly identical language in Neb. Rev. Stat. § 81-8,219(1)(a) (Reissue 1987) of the State Tort Claims Act and § 13-910(2); thus, cases construing the state exemption apply as well to the exemption given political subdivisions by § 13-910(2). See *Lemke v. Metropolitan Utilities Dist.*, 243 Neb. 633, 502 N.W.2d 80 (1993).

### 1. NATURE OF DISCRETIONARY FUNCTION EXEMPTION

In considering the discretionary function exemption under the State Tort Claims Act and holding that summary judgment should not have been granted the State, we, in *Wickersham v. State*, 218 Neb. 175, 180, 354 N.W.2d 134, 138-39 (1984), stated:

> Performance of or failure to perform a discretionary function or duty cannot be the basis for liability under the State Tort Claims Act. See *Fletcher v. State*, 216 Neb. 342, 344 N.W.2d 899 (1984); cf. *Dalehite v. United States*, 346 U.S. 15, 73 S. Ct. 956, 97 L. Ed. 1427 (1953) (Federal Tort Claims Act, 28 U.S.C. § 1346(b) and §§ 2671 et seq. (1948)).

> That which is protected under the State Tort Claims Act, § 81-8,219(1)(a), is the discretion of a governmental executive or administrator to act according to one's judgment of the best course to be taken. Such discretion includes more than the initiation of programs and activities. Discretion includes determinations or judgments made in establishing plans, specifications, or schedules of operations. Where policy judgment exists, there also exists discretion exempted from liability under the State Tort Claims Act. Cf. *Dalehite v. United States, supra.*

> However, the discretionary function or duty exemption in the State Tort Claims Act extends only to the basic policy decisions made in governmental activity, and not to

ministerial activities implementing such policy decisions. See *Koepf v. County of York*, 198 Neb. 67, 251 N.W.2d 866 (1977); cf. *Indian Towing Co. v. United States*, 350 U.S. 61, 76 S. Ct. 122, 100 L. Ed. 48 (1955) (Federal Tort Claims Act). In other words, the State is liable for negligence of its employees at the operational level, where there is no room for policy judgment. See *Eastern Air Lines v. Union Trust Company*, 221 F.2d 62 (D.C. Cir. 1955).

In *Wickersham*, the State, through its Department of Agriculture, had under statutory direction adopted regulations in conformance with regulations of the U.S. Department of Agriculture, which required that the State both test for brucellosis and directly notify, among others, purchasers of cattle which came from an infected herd. We reasoned that the State was rendered liable by its failure to comply with its own regulations by failing to timely test cattle which Wickersham had purchased and by failing to timely notify him of its subsequent discovery that the cattle he had purchased came from an infected herd.

However, in *Blitzkie v. State*, 241 Neb. 759, 491 N.W.2d 42 (1992), we affirmed the judgment in favor of the State against Blitzkie's claims that he, as an owner of hogs near an outbreak of pseudorabies, should have been notified personally and that the notice given to local veterinarians was inadequate. There, we wrote:

The very letter of § 54-701 implies that the Department of Agriculture has the discretion of "employing the most efficient and practical means" in the control and prevention of livestock disease. The evidence is uncontroverted that the Department of Agriculture did quarantine the affected animals, in compliance with the statute, and in its discretion, notified the state's veterinarians by way of newsletter. The method of notice and to whom the notice would be sent were completely discretionary functions, and plaintiff's claims that these activities were ministerial, rather than discretionary, are without merit.

*Blitzkie*, 241 Neb. at 763, 491 N.W.2d at 45.

In *Security Inv. Co. v. State*, 231 Neb. 536, 437 N.W.2d 439 (1989), we, in affirming the sustainment of the State's demurrer, held that the alleged general failure of the state Department of Banking and Finance to enforce the banking laws, take remedial steps with respect to a failing financial institution, remove certain officers of the institution, inform other financial institutions of the failing institution's condition, and put the failing institution into receivership all fell within the discretionary function. Quoting extensively from *Berkovitz v. United States*, 486 U.S. 531, 108 S. Ct. 1954, 100 L. Ed. 2d 531 (1988), we wrote:

" '[I]t is the nature of the conduct, rather than the status of the actor that governs whether the discretionary function exception applies in a given case.' " 108 S. Ct. at 1958 (quoting *United States v. Varig Airlines*, 467 U.S. 797, 104 S. Ct. 2755, 81 L. Ed. 2d 660 (1984)). The Court then described the conduct which is within the discretionary function exception: "In examining the nature of the challenged conduct, a court must first consider whether the action is a matter of choice for the acting employee. This inquiry is mandated by the language of the exception; conduct cannot be discretionary unless it involves an element of judgment or choice. See *Dalehite v. United States*, 346 U.S. 15, 34, 73 S.Ct. 956, 967, 97 L.Ed. 1427 (1953) (stating that the exception protects 'the discretion of the executive or the administrator to act according to one's judgment of the best course'). Thus, the discretionary function exception will not apply when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow. In this event, the employee has no rightful option but to adhere to the directive. And if the employee's conduct cannot appropriately be the product of judgment or choice, then there is no discretion in the conduct for the discretionary function exception to protect. Cf. *Westfall v. Erwin*, 484 U.S. [292], 108 S.Ct. 580, [585], 98 L.Ed.2d 619 (1988) (recognizing that conduct cannot be discretionary if prescribed by law).

"Moreover, assuming the challenged conduct involves

an element of judgment, a court must determine whether that judgment is of the kind that the discretionary function exception was designed to shield. The basis for the discretionary function exception was Congress' desire to 'prevent judicial "second-guessing" of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort.' *United States v. Varig Airlines, supra,* [467 U.S.] at 814, 104 S.Ct., at 2764-2765. The exception, properly construed, therefore protects only governmental actions and decisions based on considerations of public policy. See *Dalehite v. United States, supra,* [346 U.S.] at 36, 73 S.Ct., at 968 ('Where there is room for policy judgment and decision there is discretion'). In sum, the discretionary function exception insulates the Government from liability if the action challenged in the case involves the permissible exercise of policy judgment."

*Security Inv. Co.,* 231 Neb. at 544-45, 437 N.W.2d at 445.

Most recently, in *Lemke v. Metropolitan Utilities Dist.,* 243 Neb. 633, 502 N.W.2d 80 (1993), a political subdivision which retailed odorized natural gas had received information that certain flexible connectors deteriorated with age and could leak. Although it had not installed all such connectors in the area, the subdivision had emplaced several thousand of them and had been on the plaintiffs' premises to make adjustments to their gas appliances. The subdivision had in place a program which informed, through literature, its customers and, through advertisements, the general public concerning the benefits and risks involved in using natural gas. Nonetheless, the political subdivision did not undertake to inform its customers about the connector problem; instead, it merely filed the information in its library without even telling its service personnel about the defect. The plaintiffs sustained damages when, because of a deteriorated connector, an explosion occurred while one of them attempted to relight a pilot light. In affirming the judgment rendered against the political subdivision, we wrote:

[W]hen (1) a governmental entity has actual or constructive notice of a dangerous condition or hazard caused by or under the control of the governmental entity

and (2) the dangerous condition or hazard is not readily apparent to persons who are likely to be injured by the dangerous condition or hazard, the governmental entity has a nondiscretionary duty to warn of the danger or take other protective measures that may prevent injury as the result of the dangerous condition or hazard. In such a situation, a governmental entity's failure to warn or take other protective measures is not a planning-level decision involving a social, economic, or political policy judgment and, therefore, does not come within the discretionary function exemption of the Political Subdivisions Tort Claims Act.

*Id.* at 647, 502 N.W.2d at 89.

We have previously distinguished ministerial acts from discretionary functions. In *Allen v. County of Lancaster*, 218 Neb. 163, 352 N.W.2d 883 (1984), the plaintiffs alleged that the county had improperly approved the construction of a sewer which did not comply with a certain county resolution and had improperly inspected the sewer. More specifically, the plaintiffs claimed that the sewer violated seven of the various criteria set forth in five pages of the resolution, which provided that all sewers would be constructed " 'in conformance with the requirements of the health Officer who shall be guided by' " the specified criteria. *Id.* at 164, 352 N.W.2d at 884. In affirming the sustainment of the county's demurrer, we held that where a health officer must make a judgmental decision within a regulatory framework, such decision is distinguishable from a ministerial act:

In this case the health officer had a great deal of "room for policy judgment and decision," and as stated in *Dalehite* at 36, where there is such room "there is discretion." The health officer is clearly required to exercise his discretion. He is not given standards that he must follow, but instead he and the public are informed that individual sewage systems must be installed "in conformance with [his] requirements" and that, in connection with those requirements, he is to be guided by certain criteria, many of which require the exercise of further discretion.

Consideration of the second of Allens' statements set out above—that the acts complained of were ministerial—reinforces our holding herein. In *State of Nebraska ex rel. Line v. Kuhlman*, 167 Neb. 674, 682-83, 94 N.W.2d 373, 380 (1959), we stated: " 'A ministerial act has been defined as one performed in response to a duty which has been positively imposed by law and its performance required at a time and in a manner or upon conditions which are specifically designated, the duty to perform under the conditions specified not being dependent upon the officer's judgment or discretion.' "

"In Mekota v. State Board of Equalization & Assessment, 146 Neb. 370, 19 N.W.2d 633, we quoted with approval this definition: ' "A ministerial act may * * * be defined to be one which a person performs in a given state of facts, in a prescribed manner, in obedience to the mandate of legal authority, without regard to, or the exercise of, his own judgment upon the propriety of the act being done." ' "

Examination of the regulation herein, delegating authority to the health officer of Lancaster County, shows clearly that that officer is to exercise a great deal of his own judgment and that his acts are clearly not ministerial. *Allen*, 218 Neb. at 168-69, 352 N.W.2d at 886-87.

## 2. STATUTES REGULATING ACTIONS OF COUNTY DEPARTMENT

With the nature of the discretionary function exemption in mind, we turn our attention to the statutes which regulate the county department.

Neb. Rev. Stat. § 71-501 (Reissue 1990) declares:

The county boards . . . shall make and enforce regulations to prevent the introduction and spread of . . . infectious . . . diseases in their respective counties. . . . Should the board of health fail to enact rules and regulations as herein provided, it shall enforce the rules and regulations promulgated by the [state] Department of Health.

Neb. Rev. Stat. § 71-503 (Reissue 1990) reads in part:

All attending physicians shall report to the official local health department or the [state] Department of Health

promptly, upon the discovery thereof, the existence of any contagious or infectious diseases and such other disease, illness, or poisoning as the [state] Department of Health may from time to time specify.

Neb. Rev. Stat. § 71-503.01 (Reissue 1986) announces:

Whenever any statute of the state, *any ordinance or resolution of a municipal corporation or political subdivision* enacted pursuant to statute . . . requires medical practitioners or other persons to report cases of communicable diseases . . . such reports or notifications shall be confidential. . . . The appropriate board, health department, agency, or official *may*: (1) Publish analyses of such reports and information for scientific and public health purposes in such a manner as to assure that the identity of any individual concerned cannot be ascertained; (2) discuss the report or notification with the attending physician; and (3) make such investigation as deemed necessary.

(Emphasis supplied.)

Neb. Rev. Stat. § 71-505 (Reissue 1986) provides:

It shall be the duty of the [state] Department of Health, in addition to other duties provided by law, to secure and maintain in all parts of the state an official record and notification of reportable diseases, illnesses, or poisonings . . . and in all other effective ways to prevent the origin and spread of disease and promote the general public health.

Neb. Rev. Stat. § 71-1631 (Reissue 1990) states:

The board of health of each county . . . shall have the *power* herein set forth. . . . It shall, with the approval of the board of county commissioners . . . (7) enact rules and regulations . . . and enforce the same for the protection of public health and the prevention of communicable diseases within its jurisdiction, subject to the review and approval of such rules and regulations by the State Board of Health . . . (10) investigate the existence of any contagious or infectious disease and adopt measures, with the approval of the [state] Department of Health, to arrest the progress of the same . . . .

(Emphasis supplied.)

### 3. APPLICATION OF DISCRETIONARY FUNCTION EXEMPTION

Accordingly, under the relevant statutes, the county board of health, and through it the county department, had the power to make bacterial meningitis a reportable disease (§ 71-503.01); had the power and duty to make and enforce regulations to prevent the spread of any infectious disease (or to enforce the rules and regulations of the state department) (§§ 71-501 and 71-1631); and had the obligation of keeping the identity of the person having the disease confidential (§ 71-503.01).

A reading of the relevant statutes makes obvious that the duty of the county department to make and enforce regulations is painted in broad strokes and does not specify the manner in which investigations are to be conducted or the specific use to be made of the data collected. It is equally obvious that the significance of making a particular infectious disease reportable is so that data can be collected for the study of the disease and its distribution in order that proper regulations may be adopted to prevent its spread, in accordance with the requirement of § 71-501.

Thus, the situation now before us differs markedly from that presented in *Wickersham v. State*, 218 Neb. 175, 354 N.W.2d 134 (1984). While in *Wickersham* there was a specific regulation requiring testing and notification of persons in the position of the plaintiff therein, here there is not. Nor is the situation presented here like that in *Lemke v. Metropolitan Utilities Dist.*, 243 Neb. 633, 502 N.W.2d 80 (1993). Whereas in *Lemke* it was the subdivision that brought the injury-causing agent (the odorized gas) to its customers, the county department did not bring the injury-causing agent (the Haemophilus bacterium) to the population of which the girl and the minor were a part. In other words, while the subdivision in *Lemke* had dominion, and in that sense control, over the injury-causing agent, the county department did not.

Rather, the situation at hand is analogous to those presented in *Security Inv. Co. v. State*, 231 Neb. 536, 437 N.W.2d 439 (1989), and *Allen v. County of Lancaster*, 218 Neb. 163, 352 N.W.2d 883 (1984). As in *Security Inv. Co.*, how the State was to discharge its duties in supervising financial institutions was a

matter of judgment, so, here, how the disease was to be contained was a matter of judgment. As noted in *Allen*, where a health officer must make a judgmental decision within a regulatory framework, the decision is not a ministerial act but a discretionary function.

We have not been cited to, nor have we found, any statute which required that the county department ascertain that the girl attended West Omaha Day Care, that the county department contact West Omaha Day Care, or that the county department notify the parents of West Omaha Day Care's enrollees. Neither have we been cited to any such regulation. How the county department discharged its duty and how it allocated its resources in doing so was a matter of judgment based on considerations of public policy, including the allocation of resources. Thus, the county department's determination to discharge whatever duty it had through a program of educating day-care operators and offering such assistance as might be requested by such facilities was within the discretionary function exemption.

However one may view the efficacy of the county department's policy and reaction to the onset of bacterial meningitis in the girl, the courts are not at liberty to second-guess the county department's policy decisions.

## VI. JUDGMENT

Accordingly, we reverse the judgment of the district court and remand the cause with the direction that it be dismissed.

REVERSED AND REMANDED WITH DIRECTION.

WHITE, J., dissenting.

The majority holds that responsibility for the negligence of Douglas County is excused by reason of the discretionary function exemption of the Political Subdivisions Tort Claims Act. I respectfully dissent from the majority opinion, since I submit that the county had a nondiscretionary responsibility to inquire whether a day-care center was involved and to warn the day-care center and the parents of the day-care center's attendees of the incidence of bacterial meningitis.

Bacterial meningitis is an extremely dangerous disease which if not immediately treated can cause extensive and permanent

physical disabilities and, in some cases, death. The debilitating extent of this disease is particularly apparent from a consideration of Sean Thomas Jasa. As a result of the bacterial meningitis, Sean permanently suffers from seizures, severe brain damage, loss of sight and hearing, and a loss of bodily functions. Additionally, the doctors had to amputate several of Sean's fingers and his left foot.

The county collected information regarding particular cases of bacterial meningitis. This information was not readily available to persons who would be injured by the disease. Once the county had knowledge of an actual case of bacterial meningitis, it had a nondiscretionary duty to act with reasonable care. Cf. *Lemke v. Metropolitan Utilities Dist.*, 243 Neb. 633, 502 N.W.2d 80 (1993). I submit that under the circumstances of this case, reasonable care required the county at least to inquire whether the afflicted child had been in a day-care setting and to provide meaningful notice to those persons whose children had been exposed to the disease. The reasonableness of these acts is especially apparent in light of the county's extensive knowledge regarding the extremely debilitating injuries that this disease can cause, particularly to young children, and the near certainty that this disease would spread rapidly in a day-care setting.

The distinction between discretionary and ministerial acts is not as clear-cut as the majority suggests. Although the discretionary function exemption protects social, economic, and political judgments from judicial "second-guessing," the fact that a particular act involved an element of decisionmaking by the actor does not necessarily indicate that the act is within the exemption. See, *Berkovitz v. United States*, 486 U.S. 531, 108 S. Ct. 1954, 100 L. Ed. 2d 531 (1988); *Lemke, supra.* In fact, almost all acts involve some element of decisionmaking. For example, whether a state would maintain a lighthouse is a policy decision, and the entity would not be liable because of the fact that the state decided to operate the lighthouse. However, while maintaining the lighthouse a state actor may be making decisions, but these are decisions involved in implementing the state's policy and are ministerial, therefore, not subject to the discretionary function exemption. See *Indian Towing Co. v.*

*United States*, 350 U.S. 61, 76 S. Ct. 122, 100 L. Ed. 48 (1955).

The above example indicates that although decisions are being made while implementing a policy, those decisions are ministerial and must be executed with reasonable care. I recognize that the county's response to a specific case of bacterial meningitis involves decisionmaking. However, I believe that the response does not constitute the policy itself and thus must be executed with reasonable care. Once the county undertook to collect information regarding bacterial meningitis, the county should have been required to respond to that information reasonably.

From a review of the record in this case, I believe that the county's inaction despite its wealth of information cannot be attributed to a policy judgment of the type intended to be protected from judicial second-guessing. The record indicates that the county health board had a statutory duty to enact rules and regulations to prevent the spread of infectious diseases. The county board permitted these decisions to be made by various employees of the county health department. There was no written evidence presented which reflected any rules and regulations adopted by the county board regarding this delegation of authority. One member of the board testified that he believed these decisions were made by the health department's "top-staff" people. It is extremely disturbing that even the county board cannot elucidate exactly what decisionmaking authority has been granted to whom by the county board. It appears that alleged policy decisions are being made on an ad hoc basis by persons whose authority is not verifiable.

This untraceable hierarchy of decisionmaking authority effectively insulates the county from liability for its actions. A reviewing court cannot accurately determine what acts are discretionary or policy-making and what acts are ministerial or policy-implementing. The difficulty in distinguishing these is apparent from the record in this case.

According to the record, the chief of the division of clinical services for the county health department, John M. Weston, had the untethered authority to decide when and what disease control actions the county would take. However, Weston

himself provides conflicting evidence on the issue of whether the county had a policy regarding an actual case of bacterial meningitis in a day-care center.

In a response to interrogatories, Weston answered that if the county had knowledge, in 1987, that there was

> a case of bacterial meningitis in a day care center or in a day care attendee, then as a matter of policy John Weston or another employee of the department would have contacted the day care center and/or the parents of the attendee, made recommendations and suggestions to them, and offered the expertise of the Department as a resource. Weston and similar employees did not have the authority to order the day care operators or the parents of attendees to do anything. The decision as to the type of response rested with the day care operators and the parents of attendees.

At trial, Weston testified that the county health department never had a policy regarding whether the county would notify parents of day-care attendees. Weston further testified that the county health department did not have a policy regarding whether the county would notify the day-care center itself.

An epidemiology nurse employed by the county health department testified that her duties included visiting day-care centers in which the county had received notice that a communicable disease may have occurred. According to the nurse, she was to visit the day-care center to determine whether there was a chance that other children had been infected, and would make recommendations to prevent the spread of the disease. The nurse stated that she was not sent to West Omaha Day Care after the first report of bacterial meningitis or after the report of Jasa's case of bacterial meningitis.

If the county had a policy to address cases of bacterial meningitis in a day-care center, then the actions necessary to implement that policy—inquiring whether a day-care center is involved and providing meaningful notification—are nondiscretionary. On the other hand, if the county collected information of actual cases of bacterial meningitis but did not have a specific policy regarding its response to the information, then the actual response should be deemed nondiscretionary. I

do not subscribe to the theory that the county's inaction itself constitutes a protected policy decision by default. The discretionary function exemption protects policy judgments and should not shield the county from its failure to act. I am not convinced that the county has demonstrated it made a policy-type decision not to act; therefore, I respectfully dissent.

LANPHIER, J., joins in this dissent.