MICHAEL J. GABLEMAN, J.
¶ 103. {concurring). I join the majority opinion in toto as I believe it reaches the correct result under our existing immunity law. I write separately, however, to express my dismay that this court continues to apply a series of doctrines that have no connection to the text of the municipal immunity statute (Wis. Stat. § 893.80) or our decision to abrogate all governmental immunity in Holytz v. City of Milwaukee, 17 Wis. 2d 26, 115 N.W.2d 618 (1962). Rather than utilizing the nuisance approach adopted by the majority, I would instead do away with the ministerial duty and known danger exceptions and restore our immunity jurisprudence to conform with § 893.80(4) and Holytz. That is, governmental entities, officials, and employees should be entitled to immunity only for "acts done in the exercise of legislative, quasi-legislative, judicial, or quasi-judicial functions."[1] *614 § 893.80(4); see also Holytz, 17 Wis. 2d at 40. As this court has never fashioned a precise definition of that phrase, I recommend that we adopt the "planning-operational distinction" to determine whether governmental action is "legislative, quasi-legislative, judicial, or quasi-judicial." This test "grants immunity only to upper-level legislative, judicial, executive and administrative policy and planning decisions rather than to any decision that might be made." 18 Eugene McQuillin, The Law of Municipal Corporations § 53:16 (3d ed., rev. vol. 2013). If a decision or action does fall into that category, it is considered "planning level" and is immune from suit. Id. On the other hand, "[a] decision resulting from a determination based on preexisting laws, regulations, policies, or standards usually indicates that its maker is performing an operational act." Id. Immunity would not apply to activities of this nature. Id. Because the operation and maintenance of a sewerage system is by definition "operational," it does not fall into the category of actions that are legislative, quasi-legislative, judicial, or quasi-judicial. Our immunity analysis need not go any further to determine that MMSD is not shielded by governmental immunity.
I. THE HISTORY OF GOVERNMENTAL IMMUNITY
¶ 104. To better understand our current governmental immunity quagmire, it will be helpful to briefly survey the historical development of the doctrine. The concept of governmental immunity goes back to the 18th-century English common law notion that "the king could do no wrong," Linda M. Annoye, Comment, Revising Wisconsin's Government Immunity Doctrine, 88 Marq. L. Rev. 971, 973-74 (2005). Or, as Sir William Blackstone put it, "The king ... is not only incapable of *615 doing wrong, but even of thinking wrong." 1 Blackstone's Commentaries on the Laws of England 187 (Wayne Morrison ed., Cavendish Publishing Limited 2001). The first known case to apply this concept was Russell v. The Men of Devon, (1788) 100 Eng. Rep. 359 (K.B.), in which the Court of King's Bench in England held that an unincorporated county was not liable for damages caused by a faulty bridge. In setting forth the court's ruling, Justice Ashhurst reasoned that "it is better that an individual should sustain an injury than that the public should suffer an inconvenience." Id. at 362. Governmental immunity eventually migrated to the United States, first landing in Massachusetts with Mower v. Leicester, 9 Mass. 247 (1812). Wisconsin subsequently adopted the doctrine in Hayes v. City of Oshkosh, 33 Wis. 314 (1873). There, we utilized reasoning similar to Russell, stating that "[ijndividual hardship or loss must sometimes be endured in order that still greater hardship or loss to the public at large or the community may be averted." Hayes, 33 Wis. at 319.
¶ 105. In 1962 this court abrogated the longstanding common law rule of governmental immunity in Holytz, 17 Wis. 2d at 33, noting, "[tjhere are probably few tenets of American jurisprudence which have been so unanimously berated as the governmental immunity doctrine." That decision reversed the relationship between injured plaintiffs and government tortfeasors, as we held that "henceforward, so far as governmental responsibility for torts is concerned, the rule is liability —the exception is immunity." Id. at 39. However, we qualified this sea change in the law by cautioning that liability should not attach to a governmental body when it exercises its "legislative or judicial or quasi-legislative or quasi-judicial functions." Id. at 40 (citation omitted). *616 We also said that "[i]f the legislature deems it better public policy, it is, of course, free to reinstate immunity." Id. As the majority opinion observes, the year after Holytz was decided, the legislature enacted an immunity statute that closely tracked some of our language from that decision, thereby codifying the elimination of blanket governmental immunity. Majority op., ¶ 47; see also Ch. 198, Laws of 1963. The current version of the immunity statute provides that no suit may be brought against any "political corporation, governmental subdivision or any agency thereof' or its "officers, officials, agents or employees" for intentional torts or "acts done in the exercise of legislative, quasi-legislative, judicial or quasi-judicial functions."[2] Wis. Stat. § 893.80(4). But *617 while the legislature codified Holytz's abrogation of governmental immunity, for the past five decades this court has been chipping away at the Holytz decision and the immunity statute.
II. THE MINISTERIAL DUTY AND KNOWN DANGER "EXCEPTIONS"
¶ 106. The first thread of Holytz's newly woven tapestry to unravel was Lister v. Bd. of Regents, 72 Wis. 2d 282, 300-01, 240 N.W.2d 610 (1976), where this court laid down the discretionary/ministerial test for whether governmental immunity applied. In holding that the University of Wisconsin-Madison Registrar could not be sued for allegedly misclassifying a group of law students as "non-residents" for tuition purposes, we held that government employees are immune when exercising discretion, but that no immunity attaches to the negligent performance of a "ministerial duty." Id. at 300-01. We opined that within the context of governmental immunity a "duty is ministerial only when it is absolute, certain and imperative, involving merely the performance of a specific task when the law imposes, prescribes and defines the time, mode and occasion for its performance with such certainty that nothing remains for judgment or discretion." Id. at 301 (footnote omitted). As the decision on whether to classify a student as a Wisconsin resident for purposes of in-state tuition required "some discretion and judgment," the *618 Registrar was entitled to immunity and the hapless law students were not allowed to make their case that they paid too much tuition. Id. at 301-02.
¶ 107. The ministerial duty concept, though, came directly from our decision in Meyer v. Carman, 271 Wis. 329, 332, 73 N.W.2d 514 (1955). See Lister, 72 Wis. 2d at 301 n.18,19 (citingMeyer). The problem with relying on a test from Meyer, however, was that case was decided before we abrogated governmental immunity in Holytz. So while it made sense for Meyer to speak of an exception to immunity when immunity was the rule, it made no sense for Lister to adopt an exception to a concept that had already been retired both judicially and legislatively.
¶ 108. Justice Prosser has also commented on the bizarre development of the ministerial duty exception "from a context in which it was valuable and necessary" to "a context in which it is unfair and absurd." Umansky v. ABC Ins. Co., 2009 WI 82, ¶ 64, 319 Wis. 2d 622, 769 N.W.2d 1 (Prosser, J., concurring). By "shift[ing] the focus from liability to immunity," Lister turned the Holytz decision upside down without even citing to that momentous case. Id., ¶ 75. With a sleight-of-hand, Lister cut the guts out oí Holytz and essentially restored governmental immunity. As Justice Prosser accurately and poignantly put it: "[s]o far as government responsibility for torts is concerned, immunity has become the rule and liability has become the rare exception. Justice has been confined to a crawl space too narrow for most tort victims to fit." Id., ¶ 78.
¶ 109. Following Lister, this court repeatedly relied on the ministerial duty exception to stretch governmental immunity beyond both the text of the statute and the Holytz decision. For example, we have immunized such conduct as a road test examiner's purported *619 negligence in issuing a driver's license to an applicant who was allegedly too overweight to drive,[3] a university instructor's construction of a volleyball net,[4] a school district benefits specialist's incorrect advice,[5] a police officer's allegedly negligent management of a busy intersection during a rain storm,[6] and a high school guidance counselor providing inaccurate information regarding a student's scholarship eligibility requirements.[7] All of these decisions are at odds with Holytz and the immunity statute in that none of these actions can fairly be described as "legislative, quasi-legislative, judicial, or quasi-judicial functions." Wis. *620 Stat.§ 893.80(4); Holytz, 17 Wis. 2d at 40. Yet that is where this court has taken immunity law courtesy of the misappropriated ministerial duty exception.
¶ 110. In addition to having no connection whatsoever to the governing statute, the other flaw with the ministerial duty test is that it is excruciatingly narrow. As one court has put it, "it would be difficult to conceive of any official act, no matter how directly ministerial, that did not admit of some discretion in the manner of its performance, even if it involved only the driving of a nail." Ham v. Los Angeles Cnty., 189 P.462, 468 (Cal. Ct. App. 1920); see also Swanson v. United States, 229 F. Supp. 217, 219-20 (N.D. Cal. 1964) ("In a strict sense, every action of a government employee, except perhaps a conditioned reflex action, involves the use of some degree of discretion."). The upshot of this court's adoption of the ministerial duty exception is that we have in essence overturned Holytz and rewritten Wis. Stat. § 893.80.
¶ 111. The ministerial duty exception is also the progenitor responsible for the illegitimate birth of the known danger exception. In Cords v. Anderson, 80 Wis. 2d 525, 531-32, 536-38, 259 N.W.2d 672 (1977), a group of college students were injured while hiking at a state park when they fell from an unguarded and unmarked 90-foot cliff into a gorge. The plaintiffs sued the manager of the park (a state employee) for failing to put up warning signs along the trail. Id. at 537-38. The manager, naturally, asserted governmental immunity. Id. However, instead of asking whether the manager's actions were legislative, quasi-legislative, judicial, or quasi-judicial, as Holytz requires for state employees, this court (relying on Lister) framed the question as whether the manager had "an absolute, certain, or imperative duty to either place the signs warning the *621 public of the dangerous conditions existing on the upper trail or to advise his superiors of the condition with a view toward adequate protection of the public responding to the invitation to use this facility." Cords, 80 Wis. 2d at 541. Inexplicably, the court held that because the park manager knew the park terrain was dangerous, "the duty to either place warning signs or advise superiors of the conditions is, on the facts here, a duty so clear and absolute that it falls within the definition of a ministerial duty." Id. at 542 (emphasis added). I say inexplicably because the choice to use one of two options quite obviously renders the decision discretionary rather than ministerial.[8] In any event, to *622 circumvent the judicially created ministerial duty test we invented what became known as the "known danger exception," thus creating an exception to an exception. Unfortunately, neither the ministerial duty test nor the known danger test is grounded in Holytz or the immunity statute, so although we reached the correct ultimate conclusion in Cords (immunity does not apply), we took an incorrect route.
III. A NEW APPROACH FOR GOVERNMENTAL IMMUNITY JURISPRUDENCE
¶ 112. If we were to do away with the ministerial duty and known danger exceptions, what test would we use to determine whether an action is "legislative, quasi-legislative, judicial, or quasi-judicial?" I recommend that this court adopt the "planning-operational distinction." This test, which is used in some form by a majority[9] of states that no longer recognize governmen *623 tal immunity,[10] grants immunity to "planning level conduct" but not to "operational level decisions." Mc-Quillin, The Law of Municipal Corporations §53:16. Planning level conduct touches on questions of public policy and includes those governmental decisions that involve "the balancing of priorities and the weighing of budgetary considerations." Id. Operational decisions, on the other hand, "concern the day-to-day operation of government and include decisions based solely upon engineering or scientific considerations." Id. In other words, a decision to adopt (or not adopt) a certain policy would be shielded by immunity, but the implementation of the policy would be subject to traditional tort standards. Cf. Bowers v. City of Chattanooga, 826 S.W.2d 427, 431 (Tenn. 1992).
¶ 113. This approach is most consistent with the municipal immunity statute and Holytz. To begin with, it would protect "the essential acts of governmental *624 decision-making" from "judicial second-guessing or harassment by the actual or potential threat of litigation." Enghauser Mfg. Co. v. Eriksson Eng'g Ltd., 451 N.E.2d 228, 232 (Ohio 1983), superseded by Ohio's Political Subdivision Tort Liability Act, Ohio Rev. Code Ann. Ch. 2744 (West 2013). Specifically, budgetary decisions would be immunized such that a governmental entity could not be sued for inadequately funding a project. Indus. Indent. Co. v. Alaska, 669 P.2d 561, 566 (Alaska 1983). The planning-operational distinction, however, would ensure that citizens are protected from the negligent acts of governmental employees "at the operational level, where there is no room for policy judgment." Jasa v. Douglas Cnty., 510 N.W.2d 281, 288 (Neb. 1994) (citation omitted). Finally, it would restore Holytz by placing the burden on the government to show that it is entitled to immunity, as opposed to the status quo in Wisconsin, where it is now the plaintiffs responsibility to prove that immunity was pierced. McQuillin, The Law of Municipal Corporations § 53:16 (under the planning-operational test, "[t]he governmental entity seeking to establish immunity bears the burden of proving that the challenged act or omission was a policy decision made by consciously balancing risks and benefits.").
¶ 114. How would this test apply to the present case? MMSD's decision to build the Deep Tunnel system is a planning level decision entitled to immunity. Conversely, had the Deep Tunnel never been built, a plaintiff could not successfully allege that his basement was flooded as a result of MMSD's inaction. The decision not to build is shielded for the same reasons as the decision to build: it is a question of public policy that involves the evaluation of financial, political, economic, and social factors. See Conlin v. City of Saint Paul, 605 N.W.2d 396, 400 (Minn. 2000).
*625 ¶ 115. The day-to-day operation and maintenance of the Deep Tunnel is, quite obviously, "operational," and thus standard negligence principles apply in the same fashion as if the tunnel were built by a private organization. See Whitney v. City of Worcester, 366 N.E.2d 1210, 1216 (Mass. 1977) ("[A] governmental entity is not liable for negligence in the planning of sewers but may be liable for negligence in their construction and maintenance.") (citation omitted). Contrary to MMSD's assertions, this case was tried to the jury as one of operation and maintenance, not design. At a pre-trial hearing, the circuit court stated, "[t]he issue is, okay, as the tunnel is being maintained, operated and inspected by [MMSD], is it creating a nuisance[?]" The court made clear that the case "doesn't have anything to do with the way [the Deep Tunnel] was designed or constructed." Instead, "it has to do with the manner in which it is being operated, which is causing the nuisance."
¶ 116. The circuit court asked each of the parties to submit a date as to when MMSD took over the operation and maintenance of the Deep Tunnel. Both parties agreed that the date MMSD began operating the Deep Tunnel was the date the jury would use "in determining what, if any acts of negligence ... MMSD committed." After briefing and argument, the court settled on August 7, 1992, the date MMSD offered as to when the contractor certified that the Deep Tunnel project was substantially completed. The court then made the nature of the case clear to the attorneys:
[MMSD] is only responsible[,] and the jury will only be asked to assess assuming they find negligence, assess damages that occurred to the Boston Store from that day forward.
So if the proof were, for example, that all of the damages that the foundation, the Boston Store suffered *626 occurred before August 7, 1992, then the jury should enter zero dollars.
On the other hand, if all the damages occurred after August 7,1992, then whatever those amounts are, that's the number the jury should assess.
¶ 117. The negligence question submitted to the jury was consistent with the circuit court's remarks to the lawyers at the pre-trial conference: "On or after August 7,1992 was [MMSD] negligent in the manner in which it operated or maintained the tunnel near Boston Store?" After a two-and-a-half week trial, the jury found that MMSD was negligent and that this negligence was the cause of the damage to Boston Store's foundation. Bostco produced a number of expert witnesses during the trial to support its argument that the negligent operation and maintenance of the Deep Tunnel caused damage to the Boston Store, including an engineer who testified that "[t]he Boston Store has experienced large structural column movement as a result of the operation of the [Deep] Tunnel," and, "[i]f the operation of the [Deep] Tunnel continues under the current conditions, the Boston Store will experience large structural column movements requiring future repair." (Emphasis added). It is our job as an appellate court to search the record for evidence to support, not contradict, the jury's findings. Morden v. Cont'l AG, 2000 WI 51, ¶ 39, 235 Wis. 2d 325, 611 N.W.2d 659. Here, there is ample evidence in the record to buttress the factual conclusion that MMSD's negligent operation and maintenance of the Deep Tunnel unsettled Boston Store's foundation, causing millions of dollars of damage.
¶ 118. As the operation and maintenance of a sewerage system is an "operational" rather than "planning-level" decision, this is as far as our immunity *627 analysis needs to go. The conclusion that MMSD is liable for damages under this test would also be in harmony with more than a century of Wisconsin case law, which has reaffirmed that while the decision to build a public works project is entitled to immunity, a governmental entity is liable if its negligent operation and maintenance of the project causes damages or injury.[11] However, I would also add that even if MMSD *628 were correct that any negligence on its part related solely to the design of the Deep Tunnel, this is not the type of planning-level decision that should be entitled to immunity. As the Minnesota Supreme Court has held in interpreting that state's governmental immunity statute, "immunity does not bar an action when the conduct was merely a professional or scientific judgment." Fisher v. Cnty. of Rock, 596 N.W.2d 646, 652 (Minn. 1999) (citation omitted). Immunity only attaches "if in addition to professional or scientific judgments, policy considerations played a part in making a decision. . .." Id. (citation omitted). There is nothing in the record to indicate that the design of the Deep Tunnel was anything but a technocratic decision that was farmed out to an engineering firm that MMSD contracted with. While the decision to build the Deep Tunnel was planning-level conduct, the implementation of that decision was operational and thus not entitled to immunity.
IV CONCLUSION
¶ 119. We stated in Holytz that the legislature was free to reinstate governmental immunity. In the five decades since that decision, it has not done so. That choice should be respected by this court rather than undermined.

 The text of the immunity statute does not mention the state or its employees. Townsend v. Wis. Desert Horse Ass'n, 42 Wis. 2d 414, 422-23, 167 N.W.2d 425 (1969). However, Holytz v. City of Milwaukee, 17 Wis. 2d 26, 40, 115 N.W.2d 618 (1962), abrogated the common law doctrine of immunity for all governmental entities, state or municipal. Given our open invitation for the legislature to reinstate governmental immunity if it thought our decision unwise, the legislative silence with respect to state employees amounted to acceptance of our decision that "so far as governmental responsibility for torts is concerned, the rule is liability — the exception is immunity." Holytz, 17 Wis. 2d at 39; see Progressive N. Ins. Co. v. Romanshek, 2005 Wl 67, ¶ 52, 281 Wis. 2d 300, 697 N.W.2d 417 ("[Generally, legislative silence with regard to new court-made decisions indicates legislative acquiescence in those decisions.") (internal quotation marks and citation omitted). Strangely, though, this court has said that "unlike governmental immunity as applied to state employees where immunity is the rule and liability is the exception, the opposite is true for municipal actors, i.e., liability is the rule and immunity is the exception." Pries v. McMillon, 2010 WI 63, ¶ 20 n.11, 326 Wis. 2d 37, 784 N.W.2d 648 (emphasis added) (citation omitted). This observation is incorrect because the underlined language is plainly at odds with our decision in Holytz, and accordingly there should be no distinc *617 tion in the treatment of state and municipal entities or their employees. Four years ago, Justice Prosser (joined by Justice Crooks) noted this anomaly in his scholarly concurrence in Umansky v. ABC Ins. Co., 2009 WT 82, ¶¶ 46-57, 319 Wis. 2d 622, 769 N.W.2d 1. I now express my agreement with Justice Prosser's conclusion that liability is the rule and immunity the exception for both municipalities and the state.

 Lifer v. Raymond, 80 Wis. 2d 503, 512, 259 N.W.2d 537 (1977). Justice Robert Hansen colorfully summed up the issue presented in Lifer:
How fat is too fat? Who is too fat to be licensed to get behind the wheel and drive an automobile? Plaintiff alleges that the 320-pound driver of the auto in which he was a passenger was so fat that she should not have been granted a probationary license to drive an automobile, even though she passed the road test portion of the examination.
At what point on the scales does an overweight person suffer a physical disability that prevents him or her from exercising reasonable control over a motor vehicle? The plaintiff answers that the duty to determine when corpulency becomes disabling is on the road test examiner at the time a road test is administered. The plaintiff sues the defendant examiner for breaching a duty owed to the plaintiff passenger when he passed Jeannine M. Yingling in the road test portion of her examination.
Id. at 506-07.

 Kimps v. Hill, 200 Wis. 2d 1, 5, 546 N.W.2d 151 (1996).

 Kierstyn v. Racine Unified Sch. Dist., 228 Wis. 2d 81, 85, 95, 596 N.W.2d 417 (1999).

 Lodl v. Progressive N. Ins. Co., 2002 WI 71, ¶¶ 11, 31, 253 Wis. 2d 323, 646 N.W.2d 314.

 Scott v. Savers Prop. & Cas. Ins. Co., 2003 WI 60, ¶¶ 9,18, 262 Wis. 2d 127, 663 N.W.2d 715.

 This court has also inconsistently applied the known danger exception, most significantly in Lodi. In that case, a heavy rain storm triggered a power outage that caused the traffic lights to go out at a busy intersection. 253 Wis. 2d 323, ¶ 6. A police sergeant investigated the blackout and decided to open the folded stop signs that were affixed to the poles of the traffic control signals. Id., ¶ 7. Another officer arrived on the scene, called for backup, and requested that portable stop signs be brought to the intersection. Id., ¶ 8. An accident occurred minutes later, before the police backup or portable signs arrived. Id., ¶ 10. The injured plaintiff sued, alleging that the second officer who arrived on the scene had a ministerial duty to manually control traffic at the intersection. Id., ¶¶ 11-12. Extrapolating from our reasoning in Cords v. Anderson, 80 Wis. 2d 525, 259 N.W.2d 672 (1977), we explained that a dangerous situation constitutes a known danger for immunity purposes only when "there exists a known present danger of such force that the time, mode and occasion for performance is evident with such certainty that nothing remains for the exercise of judgment and discretion." Id., ¶ 38 (quoting C.L. v. Olson, 143 Wis. 2d 701, 717, 422 N.W.2d 614 (1988)). With that principle in mind, we concluded that there was no known danger, as the second officer had discretion in deciding how to respond when he arrived at the intersection. Lodi, 253 Wis. 2d 323, ¶¶ 46-47. Yet this conclusion was clearly at odds with Cords, where we held that the park manager was required to *622 take one of two options. 80 Wis. 2d at 542. For a further elaboration of this point, see Justice Bradley's dissent in Lodi. 253 Wis. 2d 323, ¶¶ 64, 68-69.

 See Indus. Indem. Co. v. Alaska, 669 P2d 561, 563 (Alaska 1983); Doe v. Arizona, 24 P3d 1269,1271 (Ariz. 2001) (en banc); Steed v. Dep't of Consumer Affairs, 138 Cal. Rpt. 3d 519, 528 (Ct. App. 2012); Cooper v. Hollis, 600 P2d 109, 111 (Colo. Ct. App. 1979); Dep't of Transp. v. Neilson, 419 So.2d 1071, 1077-78 (Fla. 1982); Julius Rothschild & Co. v. Hawaii, 655 P2d 877, 880-81 (Haw. 1982) (per curiam); Jones v. City of St. Maries, 727 P.2d 1161, 1163-64 (Idaho 1986); Peavler v. Bd. of Comm'rs of Monroe Cnty., 528 N.E.2d 40, 45 (Ind. 1988); Fowler v. Roberts, 556 So.2d 1, 15 (La. 1989); Jorgensen v. Dep't of Transp., 969 A.2d 912, 917 (Me. 2009); Whitney v. City of Worcester, 366 N.E.2d 1210, 1216 (Mass. 1977); Ross v. Consumers Power Co., 363 N.W.2d 641, 647 (Mich. 1984) (per curiam); Conlin v. City of Saint Paul, 605 N.W.2d 396, 400 (Minn. 2000); Jasa v. Douglas Cnty., 510 N.W.2d 281, 288 (Neb. 1994); Schoff v. City of *623 Somersworth, 630 A.2d 783, 787 (N.H. 1993); Costa v. Josey, 415 A.2d 337, 341-43 (N.J. 1980); Enghauser Mfg. Co. v. Eriksson Eng'g Ltd., 451 N.E.2d 228, 232 (Ohio 1983), superseded by Ohio's Political Subdivision Tort Liability Act, Ohio Rev. Code Ann. Ch. 2744 (West 2013); Nguyen v. Oklahoma, 788 P.2d 962, 964-65 (Okla. 1990); Costopoulos v. Gibboney, 579 A.2d 985, 988 (Pa. Commw. Ct. 1990); Bowers v. City of Chattanooga, 826 S.W.2d 427, 430-31 (Tenn. 1992); Stephen F. Austin State Univ. v. Flynn, 228 S.W.3d 653, 657-58 (Tex. 2007); Johnson v. Utah Dep't of Transp., 133 P.3d 402, 409 (Utah 2006); Avellaneda v. Washington, 273 P.3d 477, 482-83 (Wash. Ct. App. 2012); Darrar v. Bourke, 910 P.2d 572, 577 (Wyo. 1996).

 "The majority rule is that in the absence of a statute granting immunity, a municipality is liable for its negligence in the same manner as a private person or corporation. The common-law doctrine of sovereign or governmental immunity is a viable defense in this country only in a minority of states [14] and only in certain circumstances." 18 Eugene McQuillin, The Law of Municipal Corporations § 53:3 (3d ed., rev. vol. 2013).

 See Lange v. Town of Norway, 77 Wis. 2d 313, 320, 253 N.W.2d 240 (1977) ("[G]overnmental immunity would apply to acquisition of the [dam and floodgate] by the town. However, such governmental immunity would not include a failure to maintain as to a condition of disrepair or defect or a failure to properly operate said floodgate."); Naker v. Town of Trenton, 62 Wis. 2d 654, 660, 217 N.W.2d 665 (1974) (per curiam) ("Once the decision is made and the sign is erected, the legislative function is terminated and the doctrine of Holytz that imposes liability for want of ordinary care takes over."); Christian v. City of New London, 234 Wis. 123, 129, 290 N.W. 621 (1940)("The doctrine of the cases dealing with municipally owned waterworks is that the municipality must use proper care in maintaining the means of storage and distribution, or respond in damages to anyone injured."); Mitchell Realty Co. v. City of West Allis, 184 Wis. 352, 363, 199 N.W. 390 (1924) ("In creating a nuisance [in managing a sewage disposal plant] .. ., [the City] must respond in damages ...."); Winchell v. City of Waukesha, 110 Wis. 101, 109, 85 N.W. 668 (1901) (the legislative authority to "install a sewer system carries no implication of authority to create or maintain a nuisance, and... it matters not whether such nuisance results from negligence or from the plan adopted. If such nuisance he created, the same remedies may be invoked as if the perpetrator were an individual."); Welch v. City of Appleton, 2003 WI App 133, ¶ 24, 265 Wis. 2d 688, 666 N.W.2d 511 ("Maintenance of sewers so as not to cause injury is generally considered ministerial compared to the discretionary decision relating to design or implementation of a system.") (citation omitted); Menick v. City of Menasha, 200 Wis. 2d 737, 745, 547 N.W.2d 778 (Ct. App. 1996) ("[W]hile the decision to install and provide a sewer system in a community is a discretionary decision, there is no discretion as to maintaining the system so *628 as not to cause injury to residents. The actions of the City in operating and maintaining the sewer system do not fall within the immunity provisions of [Wis. Stat.] § 893.80.").